# INTERNATIONAL BROTHERHOOD OF TEAMSTERS *v.* UNITED STATES ET AL.

No. 75–636.   Argued January 10, 1977—Decided May 31, 1977*

*Together with No. 75–672, *T. I. M. E.–D. C., Inc.* v. *United States et al.*, also on certiorari to the same court.

*L. N. D. Wells, Jr.*, argued the cause for petitioner in No. 75–636. With him on the briefs were *David Previant* and *G. William Baab. Robert D. Shuler* argued the cause for petitioner in No. 75–672. With him on the brief was *John W. Ester.*

*Deputy Solicitor General Wallace* argued the cause for the United States et al. in both cases. With him on the brief were *Solicitor General Bork, Assistant Attorney General Pottinger, Thomas S. Martin, Brian K. Landsberg, David L. Rose, William B. Fenton, Jessica Dunsay Silver,* and *Abner W. Sibal.*†

_____

†*Jack Greenberg, O. Peter Sherwood, Barry L. Goldstein,* and *Eric Schnapper* filed a brief for the NAACP Legal Defense and Educational Fund, Inc., as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Michael A. Warner, Robert E. Williams,* and *Douglas S. McDowell* for the Equal Employment Advisory Council; and by *W. Walton Garrett* for the Over the Road Drivers Assn., Inc.

MR. JUSTICE STEWART delivered the opinion of the Court.

This litigation brings here several important questions under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.* (1970 ed. and Supp. V). The issues grow out of alleged unlawful employment practices engaged in by an employer and a union. The employer is a common carrier of motor freight with nationwide operations, and the union represents a large group of its employees. The District Court and the Court of Appeals held that the employer had violated Title VII by engaging in a pattern and practice of employment discrimination against Negroes and Spanish-surnamed Americans, and that the union had violated the Act by agreeing with the employer to create and maintain a seniority system that perpetuated the effects of past racial and ethnic discrimination. In addition to the basic questions presented by these two rulings, other subsidiary issues must be resolved if violations of Title VII occurred—issues concerning the nature of the relief to which aggrieved individuals may be entitled.

I

The United States brought an action in a Tennessee federal court against the petitioner T. I. M. E.-D. C., Inc. (company), pursuant to § 707 (a) of the Civil Rights Act of 1964, 42 U. S. C. § 2000e–6 (a).[1] The complaint charged that the

---

[1] At the time of suit the statute provided as follows:

"(a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint (1) signed by him (or in his absence the Acting Attorney General), (2) setting forth facts pertaining to such pattern or practice, and (3) requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or

company had followed discriminatory hiring, assignment, and promotion policies against Negroes at its terminal in Nashville, Tenn.[2] The Government brought a second action against the company almost three years later in a Federal District Court in Texas, charging a pattern and practice of employment discrimination against Negroes and Spanish-surnamed persons throughout the company's transportation system. The petitioner International Brotherhood of Teamsters (union) was joined as a defendant in that suit. The two actions were consolidated for trial in the Northern District of Texas.

The central claim in both lawsuits was that the company had engaged in a pattern or practice of discriminating against minorities in hiring so-called line drivers. Those Negroes and Spanish-surnamed persons who had been hired, the Government alleged, were given lower paying, less desirable jobs as servicemen or local city drivers, and were thereafter discriminated against with respect to promotions and transfers.[3] In

---

practice, as he deems necessary to insure the full enjoyment of the rights herein described."

Section 707 was amended by § 5 of the Equal Employment Opportunity Act of 1972, 86 Stat. 107, 42 U. S. C. § 2000e–6 (c) (1970 ed., Supp. V), to give the Equal Employment Opportunity Commission, rather than the Attorney General, the authority to bring "pattern or practice" suits under that section against private-sector employers. In 1974, an order was entered in this action substituting the EEOC for the United States but retaining the United States as a party for purposes of jurisdiction, appealability, and related matters. See 42 U. S. C. § 2000e–6 (d) (1970 ed., Supp. V).

[2] The named defendant in this suit was T. I. M. E. Freight, Inc., a predecessor of T. I. M. E.-D. C., Inc. T. I. M. E.-D. C., Inc., is a nationwide system produced by 10 mergers over a 17-year period. See *United States* v. *T. I. M. E.-D. C., Inc.*, 517 F. 2d 299, 304, and n. 6 (CA5). It currently has 51 terminals and operates in 26 States and three Canadian Provinces.

[3] *Line drivers,* also known as over-the-road drivers, engage in longdistance hauling between company terminals. They compose a separate bargaining unit at the company. Other distinct bargaining units include

this connection the complaint also challenged the seniority system established by the collective-bargaining agreements between the employer and the union. The Government sought a general injunctive remedy and specific "make whole" relief for all individual discriminatees, which would allow them an opportunity to transfer to line-driver jobs with full company seniority for all purposes.

The cases went·to trial [4] and the District Court found that

_servicemen,_ who service trucks, unhook tractors and trailers, and perform similar tasks; and _city operations,_ composed of dockmen, hostlers, and city drivers who pick up and deliver freight within the immediate area of a particular terminal. All of these employees were represented by the petitioner union.

[4] Following the receipt of evidence, but before decision, the Government and the company consented to the entry of a Decree in Partial Resolution of Suit. The consent decree did not constitute an adjudication on the merits. The company agreed, however, to undertake a minority recruiting program; to accept applications from all Negroes and Spanish-surnamed Americans who inquired about employment, whether or not vacancies existed, and to keep such applications on file and notify applicants of job openings; to keep specific employment and recruiting records open to inspection by the Government and to submit quarterly reports to the District Court; and to adhere to certain uniform employment qualifications respecting hiring and promotion to line driver and other jobs.

The decree further provided that future job vacancies at any company terminal would be filled first "[b]y those persons who may be found by the Court, if any, to be individual or class discriminatees suffering the present effects of past discrimination because of race or national origin prohibited by Title VII of the Civil Rights Act of 1964." Any remaining vacancies could be filled by "any other persons," but the company obligated itself to hire one Negro or Spanish-surnamed person for every white person hired at any terminal until the percentage of minority workers at that terminal equaled the percentage of minority group members in the population of the metropolitan area surrounding the terminal. Finally, the company agreed to pay $89,500 in full settlement of any backpay obligations. Of this sum, individual payments not exceeding $1,500 were to be paid to "alleged individual and class discriminatees" identified by the Government.

The Decree in Partial Resolution of Suit narrowed the scope of the litigation, but the District Court still had to determine whether unlawful

the Government had shown "by a preponderance of the evidence that T. I. M. E.-D. C. and its predecessor companies were engaged in a plan and practice of discrimination in violation of Title VII . . . ." [5] The court further found that the seniority system contained in the collective-bargaining contracts between the company and the union violated Title VII because it "operate[d] to impede the free transfer of minority groups into and within the company." Both the company and the union were enjoined from committing further violations of Title VII.

With respect to individual relief the court accepted the Government's basic contention that the "affected class" of discriminatees included all Negro and Spanish-surnamed incumbent employees who had been hired to fill city operations or serviceman jobs at every terminal that had a line-driver operation.[6] All of these employees, whether hired before or after the effective date of Title VII, thereby became entitled to preference over all other applicants with respect to consideration for future vacancies in line-driver jobs.[7] Finding that members of the affected class had been injured in different degrees, the court created three subclasses. Thirty persons who had produced "the most convincing evidence of discrimination and harm" were found to have suffered "severe injury." The court ordered that they be offered the opportunity to fill line-driver jobs with competitive seniority dating back to July 2,

---

discrimination had occurred. If so, the court had to identify the actual discriminatees entitled to fill future job vacancies under the decree. The validity of the collective-bargaining contract's seniority system also remained for decision, as did the question whether any discriminatees should be awarded additional equitable relief such as retroactive seniority.

[5] The District Court's memorandum decision is reported at 6 FEP Cases 690 (1974) and 6 EPD ¶ 8979 (1973–1974).

[6] The Government did not seek relief for Negroes and Spanish-surnamed Americans hired at a particular terminal after the date on which that terminal first employed a minority group member as a line driver.

[7] See n. 4, *supra*.

1965, the effective date of Title VII.[8]   A second subclass included four persons who were "very possibly the objects of discrimination" and who "were likely harmed," but as to whom there had been no specific evidence of discrimination and injury.   The court decreed that these persons were entitled to fill vacancies in line-driving jobs with competitive seniority as of January 14, 1971, the date on which the Government had filed its systemwide lawsuit.   Finally, there were over 300 remaining members of the affected class as to whom there was "no evidence to show that these individuals were either harmed or not harmed individually."   The court ordered that they be considered for line-driver jobs [9] ahead of any applicants from the general public but behind the two other subclasses.   Those in the third subclass received no retroactive seniority; their competitive seniority as line drivers would begin with the date they were hired as line drivers. The court further decreed that the right of any class member to fill a line-driver vacancy was subject to the prior recall rights of laid-off line drivers, which under the collective-bargaining agreements then in effect extended for three years.[10]

---

[8] If an employee in this class had joined the company after July 2, 1965, then the date of his initial employment rather than the effective date of Title VII was to determine his competitive seniority.

[9] As with the other subclasses, there were a few individuals in the third group who were found to have been discriminated against with respect to jobs other than line driver.   There is no need to discuss them separately in this opinion.

[10] This provision of the decree was qualified in one significant respect. Under the Southern Conference Area Over-the-Road Supplemental Agreement between the employer and the union, line drivers employed at terminals in certain Southern States work under a "modified" seniority system.   Under the modified system an employee's seniority is not confined strictly to his home terminal.   If he is laid off at his home terminal he can move to another terminal covered by the Agreement and retain his seniority, either by filling a vacancy at the other terminal or by "bumping" a junior line driver out of his job if there is no vacancy.   The modified

The Court of Appeals for the Fifth Circuit agreed with the basic conclusions of the District Court: that the company had engaged in a pattern or practice of employment discrimination and that the seniority system in the collective-bargaining agreements violated Title VII as applied to victims of prior discrimination. 517 F. 2d 299. The appellate court held, however, that the relief ordered by the District Court was inadequate. Rejecting the District Court's attempt to trisect the affected class, the Court of Appeals held that all Negro and Spanish-surnamed incumbent employees were entitled to bid for future line-driver jobs on the basis of their company seniority, and that once a class member had filled a job, he could use his full company seniority—even if it predated the effective date of Title VII—for all purposes, including bidding and layoff. This award of retroactive seniority was to be limited only by a "qualification date" formula, under which seniority could not be awarded for periods prior to the date when (1) a line-driving position was vacant,[11] *and* (2) the class member met (or would have met, given the opportunity) the qualifications for employment as a line driver.[12] Finally,

system also requires that any new vacancy at a covered terminal be offered to laid-off line drivers at all other covered terminals before it is filled by any other person. The District Court's final decree, as amended slightly by the Court of Appeals, 517 F. 2d 299, 323, altered this system by requiring that any vacancy be offered to all members of all three subclasses before it may be filled by laid-off line drivers from other terminals.

[11] Although the opinion of the Court of Appeals in this case did not specifically mention the requirement that a vacancy exist, it is clear from earlier and later opinions of that court that this requirement is a part of the Fifth Circuit's "qualification date" formula. See, *e. g.*, *Rodriguez* v. *East Texas Motor Freight*, 505 F. 2d 40, 63 n. 29, rev'd on other grounds, *post*, p. 395, cited in 517 F. 2d, at 318 n. 35; *Sagers* v. *Yellow Freight System, Inc.*, 529 F. 2d 721, 731–734.

[12] For example, if a class member began his tenure with the company on January 1, 1966, at which time he was qualified as a line driver and a line-driving vacancy existed, his competitive seniority upon becoming a line driver would date back to January 1, 1966. If he became qualified

the Court of Appeals modified that part of the District Court's decree that had subjected the rights of class members to fill future vacancies to the recall rights of laid-off employees. Holding that the three-year priority in favor of laid-off workers "would unduly impede the eradication of past discrimination," *id.*, at 322, the Court of Appeals ordered that class members be allowed to compete for vacancies with laid-off employees on the basis of the class members' retroactive seniority. Laid-off line drivers would retain their prior recall rights with respect only to "purely temporary" vacancies. *Ibid.*[13]

The Court of Appeals remanded the case to the District Court to hold the evidentiary hearings necessary to apply these remedial principles. We granted both the company's and the union's petitions for certiorari to consider the significant questions presented under the Civil Rights Act of 1964, 425 U. S. 990.

## II

In this Court the company and the union contend that their conduct did not violate Title VII in any respect, asserting first that the evidence introduced at trial was insufficient to show that the company engaged in a "pattern or practice" of employment discrimination. The union further contends that the seniority system contained in the collective-bargaining agreements in no way violated Title VII. If these contentions are correct, it is unnecessary, of course, to reach any of the issues concerning remedies that so occupied the attention of the Court of Appeals.

## A

Consideration of the question whether the company engaged in a pattern or practice of discriminatory hiring prac-

---

or if a vacancy opened up only at a later date, then that later date would be used.

[13] The Court of Appeals also approved (with slight modification) the part of the District Court's order that allowed class members to fill

tices involves controlling legal principles that are relatively clear. The Government's theory of discrimination was simply that the company, in violation of § 703 (a) of Title VII,[14] regularly and purposefully treated Negroes and Spanish-surnamed Americans less favorably than white persons. The disparity in treatment allegedly involved the refusal to recruit, hire, transfer, or promote minority group members on an equal basis with white people, particularly with respect to line-driving positions. The ultimate factual issues are thus simply whether there was a pattern or practice of such disparate treatment and, if so, whether the differences were "racially premised." *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792, 805 n. 18.[15]

---

vacancies at a particular terminal ahead of line drivers laid off at other terminals. See n. 10, *supra*.

[14] Section 703 (a) of Title VII, 42 U. S. C. § 2000e-2 (a) (1970 ed. and Supp. V), provides:

"(a) It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

[15] "Disparate treatment" such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. See, *e. g.*, *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 265–266. Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII. See, *e. g.*, 110 Cong. Rec. 13088 (1964) (remarks of Sen. Humphrey) ("What the bill does . . . is simply to make it an illegal practice to use race as a factor in denying employment. It provides that men and

As the plaintiff, the Government bore the initial burden of making out a prima facie case of discrimination. *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 425; *McDonnell Douglas Corp.* v. *Green, supra,* at 802. And, because it alleged a systemwide pattern or practice of resistance to the full enjoyment of Title VII rights, the Government ultimately had to prove more than the mere occurrence of isolated or "accidental" or sporadic discriminatory acts. It had to establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice.[16]

women shall be employed on the basis of their qualifications, not as Catholic citizens, not as Protestant citizens, not as Jewish citizens, not as colored citizens, but as citizens of the United States").

Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. See *infra,* at 349. Proof of discriminatory motive, we have held, is not required under a disparate-impact theory. Compare, *e. g., Griggs* v. *Duke Power Co.,* 401 U. S. 424, 430–432, with *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792, 802–806. See generally B. Schlei & P. Grossman, Employment Discrimination Law 1–12 (1976); Blumrosen, Strangers in Paradise: *Griggs* v. *Duke Power Co.* and the Concept of Employment Discrimination, 71 Mich. L. Rev. 59 (1972). Either theory may, of course, be applied to a particular set of facts.

[16] The "pattern or practice" language in § 707 (a) of Title VII, *supra,* at 328 n. 1, was not intended as a term of art, and the words reflect only their usual meaning. Senator Humphrey explained:

"[A] pattern or practice would be present only where the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized nature. There would be a pattern or practice if, for example, a number of companies or persons in the same industry or line of business discriminated, if a chain of motels or restaurants practiced racial discrimination throughout all or a significant part of its system, or if a company repeatedly and regularly engaged in acts prohibited by the statute.

.        .        .        .        .

"The point is that single, insignificant, isolated acts of discrimination by

We agree with the District Court and the Court of Appeals that the Government carried its burden of proof. As of March 31, 1971, shortly after the Government filed its complaint alleging systemwide discrimination, the company had 6,472 employees. Of these, 314 (5%) were Negroes and 257 (4%) were Spanish-surnamed Americans. Of the 1,828 line drivers, however, there were only 8 (0.4%) Negroes and 5 (0.3%) Spanish-surnamed persons, and all of the Negroes had been hired after the litigation had commenced. With one exception—a man who worked as a line driver at the Chicago terminal from 1950 to 1959—the company and its predecessors *did not employ a Negro on a regular basis as a line driver until 1969.* And, as the Government showed, even in 1971 there were terminals in areas of substantial Negro population where all of the company's line drivers were white.[17] A great majority of the Negroes (83%) and Spanish-surnamed Americans

a single business would not justify a finding of a pattern or practice . . . ." 110 Cong. Rec. 14270 (1964).

This interpretation of "pattern or practice" appears throughout the legislative history of § 707 (a), and is consistent with the understanding of the identical words as used in similar federal legislation. See 110 Cong. Rec. 12946 (1964) (remarks of Sen. Magnuson) (referring to § 206 (a) of the Civil Rights Act of 1964, 42 U. S. C. § 2000a–5); 110 Cong. Rec. 13081 (1964) (remarks of Sen. Case); *id.,* at 14239 (remarks of Sen. Humphrey); *id.,* at 15895 (remarks of Rep. Celler). See also *United States* v. *Jacksonville Terminal Co.,* 451 F. 2d 418, 438, 441 (CA5); *United States* v. *Ironworkers Local 86,* 443 F. 2d 544, 552 (CA9); *United States* v. *West Peachtree Tenth Corp.,* 437 F. 2d 221, 227 (CA5); *United States* v. *Mayton,* 335 F. 2d 153, 158–159 (CA5).

[17] In Atlanta, for instance, Negroes composed 22.35% of the population in the surrounding metropolitan area and 51.31% of the population in the city proper. The company's Atlanta terminal employed 57 line drivers. All were white. In Los Angeles, 10.84% of the greater metropolitan population and 17.88% of the city population were Negro. But at the company's two Los Angeles terminals there was not a single Negro among the 374 line drivers. The proof showed similar disparities in San Francisco, Denver, Nashville, Chicago, Dallas, and at several other terminals.

(78%) who did work for the company held the lower paying city operations and serviceman jobs,[18] whereas only 39% of the nonminority employees held jobs in those categories.

The Government bolstered its statistical evidence with the testimony of individuals who recounted over 40 specific instances of discrimination. Upon the basis of this testimony the District Court found that "[n]umerous qualified black and Spanish-surnamed American applicants who sought line driving jobs at the company over the years, either had their requests ignored, were given false or misleading information about requirements, opportunities, and application procedures, or were not considered and hired on the same basis that whites were considered and hired." Minority employees who wanted to transfer to line-driver jobs met with similar difficulties.[19]

---

[18] Although line-driver jobs pay more than other jobs, and the District Court found them to be "considered the most desirable of the driving jobs," it is by no means clear that all employees, even driver employees, would prefer to be line drivers. See *infra,* at 369–370, and n. 55. Of course, Title VII provides for equal opportunity to compete for *any* job, whether it is thought better or worse than another. See, *e. g., United States* v. *Hayes Int'l Corp.,* 456 F. 2d 112, 118 (CA5); *United States* v. *National Lead Co.,* 438 F. 2d 935, 939 (CA8).

[19] Two examples are illustrative:

George Taylor, a Negro, worked for the company as a city driver in Los Angeles, beginning late in 1966. In 1968, after hearing that a white city driver had transferred to a line-driver job, he told the terminal manager that he also would like to consider line driving. The manager replied that there would be "a lot of problems on the road . . . with different people, Caucasian, et cetera," and stated: "I don't feel that the company is ready for this right now. . . . Give us a little time. It will come around, you know." Mr. Taylor made similar requests some months later and got similar responses. He was never offered a line-driving job or an application.

Feliberto Trujillo worked as a dockman at the company's Denver terminal. When he applied for a line-driver job in 1967, he was told by a personnel officer that he had one strike against him. He asked what that was and was told: "You're a Chicano, and as far as we know, there isn't a Chicano driver in the system."

The company's principal response to this evidence is that statistics can never in and of themselves prove the existence of a pattern or practice of discrimination, or even establish a prima facie case shifting to the employer the burden of rebutting the inference raised by the figures. But, as even our brief summary of the evidence shows, this was not a case in which the Government relied on "statistics alone." The individuals who testified about their personal experiences with the company brought the cold numbers convincingly to life.

In any event, our cases make it unmistakably clear that "[s]tatistical analyses have served and will continue to serve an important role" in cases in which the existence of discrimination is a disputed issue. *Mayor of Philadelphia* v. *Educational Equality League,* 415 U. S. 605, 620. See also *McDonnell Douglas Corp.* v. *Green,* 411 U. S., at 805. Cf. *Washington* v. *Davis,* 426 U. S. 229, 241–242. We have repeatedly approved the use of statistical proof, where it reached proportions comparable to those in this case, to establish a prima facie case of racial discrimination in jury selection cases, see, *e. g., Turner* v. *Fouche,* 396 U. S. 346; *Hernandez* v. *Texas,* 347 U. S. 475; *Norris* v. *Alabama,* 294 U. S. 587. Statistics are equally competent in proving employment discrimination.[20]

---

[20] Petitioners argue that statistics, at least those comparing the racial composition of an employer's work force to the composition of the population at large, should never be given decisive weight in a Title VII case because to do so would conflict with § 703 (j) of the Act, 42 U. S. C. § 2000e–2 (j). That section provides:

"Nothing contained in this subchapter shall be interpreted to require any employer . . . to grant preferential treatment to any individual or to any group because of the race . . . or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race . . . or national origin employed by any employer . . . in comparison with the total number or percentage of persons of such race . . . or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area."

The argument fails in this case because the statistical evidence was not

We caution only that statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances. See, *e. g., Hester* v. *Southern R. Co.,* 497 F. 2d 1374, 1379–1381 (CA5).

In addition to its general protest against the use of statistics in Title VII cases, the company claims that in this case the statistics revealing racial imbalance are misleading because they fail to take into account the company's particular busi-

offered or used to support an erroneous theory that Title VII requires an employer's work force to be racially balanced. Statistics showing racial or ethnic imbalance are probative in a case such as this one only because such imbalance is often a telltale sign of purposeful discrimination; absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired. Evidence of longlasting and gross disparity between the composition of a work force and that of the general population thus may be significant even though § 703 (j) makes clear that Title VII imposes no requirement that a work force mirror the general population. See, *e. g., United States* v. *Sheet Metal Workers Local 36,* 416 F. 2d 123, 127 n. 7 (CA8). Considerations such as small sample size may, of course, detract from the value of such evidence, see, *e. g., Mayor of Philadelphia* v. *Educational Equality League,* 415 U. S. 605, 620–621, and evidence showing that the figures for the general population might not accurately reflect the pool of qualified job applicants would also be relevant. *Ibid.* See generally Schlei & Grossman, *supra,* n. 15, at 1161–1193.

"Since the passage of the Civil Rights Act of 1964, the courts have frequently relied upon statistical evidence to prove a violation. . . . In many cases the only available avenue of proof is the use of racial statistics to uncover clandestine and covert discrimination by the employer or union involved." *United States* v. *Ironworkers Local 86,* 443 F. 2d, at 551. See also, *e. g., Pettway* v. *American Cast Iron Pipe Co.,* 494 F. 2d 211, 225 n. 34 (CA5); *Brown* v. *Gaston County Dyeing Mach. Co.,* 457 F. 2d 1377, 1382 (CA4); *United States* v. *Jacksonville Terminal Co.,* 451 F. 2d, at 442; *Parham* v. *Southwestern Bell Tel. Co.,* 433 F. 2d 421, 426 (CA8); *Jones* v. *Lee Way Motor Freight, Inc.,* 431 F. 2d 245, 247 (CA10).

ness situation as of the effective date of Title VII. The company concedes that its line drivers were virtually all white in July 1965, but it claims that thereafter business conditions were such that its work force dropped. Its argument is that low personnel turnover, rather than post-Act discrimination, accounts for more recent statistical disparities. It points to substantial minority hiring in later years, especially after 1971, as showing that any pre-Act patterns of discrimination were broken.

The argument would be a forceful one if this were an employer who, at the time of suit, had done virtually no new hiring since the effective date of Title VII. But it is not. Although the company's total number of employees apparently dropped somewhat during the late 1960's, the record shows that many line drivers continued to be hired throughout this period, and that almost all of them were white.[21] To be sure, there were improvements in the company's hiring practices. The Court of Appeals commented that "T. I. M. E.-D. C.'s recent minority hiring progress stands as a laudable good faith effort to eradicate the effects of past discrimination in the area of hiring and initial assignment."[22] 517 F. 2d, at 316. But the District Court and the Court of Appeals found upon substantial evidence that the company had engaged in a course of discrimination that continued well after the effective date of Title VII. The company's later changes in its hiring and

[21] Between July 2, 1965, and January 1, 1969, hundreds of line drivers were hired systemwide, either from the outside or from the ranks of employees filling other jobs within the company. None was a Negro. Government Exhibit 204.

[22] For example, in 1971 the company hired 116 new line drivers, of whom 16 were Negro or Spanish-surnamed Americans. Minority employees composed 7.1% of the company's systemwide work force in 1967 and 10.5% in 1972. Minority hiring increased greatly in 1972 and 1973, presumably due at least in part to the existence of the consent decree. See 517 F. 2d, at 316 n. 31.

promotion policies could be of little comfort to the victims of the earlier post-Act discrimination, and could not erase its previous illegal conduct or its obligation to afford relief to those who suffered because of it. Cf. *Albemarle Paper Co.* v. *Moody,* 422 U. S., at 413–423.[23]

The District Court and the Court of Appeals, on the basis of substantial evidence, held that the Government had proved a prima facie case of systematic and purposeful employment discrimination, continuing well beyond the effective date of Title VII. The company's attempts to rebut that conclusion were held to be inadequate.[24] For the reasons we have sum-

---

[23] The company's narrower attacks upon the statistical evidence—that there was no precise delineation of the areas referred to in the general population statistics, that the Government did not demonstrate that minority populations were located close to terminals or that transportation was available, that the statistics failed to show what portion of the minority population was suited by age, health, or other qualifications to hold trucking jobs, etc.—are equally lacking in force. At best, these attacks go only to the accuracy of the comparison between the composition of the company's work force at various terminals and the general population of the surrounding communities. They detract little from the Government's further showing that Negroes and Spanish-surnamed Americans who were hired were overwhelmingly excluded from line-driver jobs. Such employees were willing to work, had access to the terminal, were healthy and of working age, and often were at least sufficiently qualified to hold city-driver jobs. Yet they became line drivers with far less frequency than whites. See, *e. g.,* Pretrial Stipulation 14, summarized in 517 F. 2d, at 312 n. 24 (of 2,919 whites who held driving jobs in 1971, 1,802 (62%) were line drivers and 1,117 (38%) were city drivers; of 180 Negroes and Spanish-surnamed Americans who held driving jobs, 13 (7%) were line drivers and 167 (93%) were city drivers).

In any event, fine tuning of the statistics could not have obscured the glaring absence of minority line drivers. As the Court of Appeals remarked, the company's inability to rebut the inference of discrimination came not from a misuse of statistics but from "the inexorable zero." *Id.,* at 315.

[24] The company's evidence, apart from the showing of recent changes in hiring and promotion policies, consisted mainly of general statements that

marized, there is no warrant for this Court to disturb the findings of the District Court and the Court of Appeals on this basic issue. See *Blau* v. *Lehman,* 368 U. S. 403, 408–409; *Faulkner* v. *Gibbs,* 338 U. S. 267, 268; *United States* v. *Dickinson,* 331 U. S. 745, 751; *United States* v. *Commercial Credit Co.,* 286 U. S. 63, 67; *United States* v. *Chemical Foundation, Inc.,* 272 U. S. 1, 14; *Baker* v. *Schofield,* 243 U. S. 114, 118; *Towson* v. *Moore,* 173 U. S. 17, 24.

B

The District Court and the Court of Appeals also found that the seniority system contained in the collective-bargaining agreements between the company and the union operated to violate Title VII of the Act.

For purposes of calculating benefits, such as vacations, pensions, and other fringe benefits, an employee's seniority under this system runs from the date he joins the company, and takes into account his total service in all jobs and bargaining units. For competitive purposes, however, such as determining the order in which employees may bid for particular jobs, are laid off, or are recalled from layoff, it is bargaining-unit seniority that controls. Thus, a line driver's seniority,

it hired only the best qualified applicants. But "affirmations of good faith in making individual selections are insufficient to dispel a prima facie case of systematic exclusion." *Alexander* v. *Louisiana,* 405 U. S. 625, 632.

The company also attempted to show that all of the witnesses who testified to specific instances of discrimination either were not discriminated against or suffered no injury. The Court of Appeals correctly ruled that the trial judge was not bound to accept this testimony and that it committed no error by relying instead on the other overpowering evidence in the case. 517 F. 2d, at 315. The Court of Appeals was also correct in the view that individual proof concerning each class member's specific injury was appropriately left to proceedings to determine individual relief. In a suit brought by the Government under § 707 (a) of the Act the District Court's initial concern is in deciding whether the Government has proved that the defendant has engaged in a pattern or practice of discriminatory conduct. See *infra,* at 360–362.

for purposes of bidding for particular runs [25] and protection against layoff, takes into account only the length of time he has been a line driver at a particular terminal.[26]  The practical effect is that a city driver or serviceman who transfers to a line-driver job must forfeit all the competitive seniority he has accumulated in his previous bargaining unit and start at the bottom of the line drivers' "board."

The vice of this arrangement, as found by the District Court and the Court of Appeals, was that it "locked" minority workers into inferior jobs and perpetuated prior discrimination by discouraging transfers to jobs as line drivers.  While the disincentive applied to all workers, including whites, it was Negroes and Spanish-surnamed persons who, those courts found, suffered the most because many of them had been denied the equal opportunity to become line drivers when they were initially hired, whereas whites either had not sought or were refused line-driver positions for reasons unrelated to their race or national origin.

The linchpin of the theory embraced by the District Court and the Court of Appeals was that a discriminatee who must forfeit his competitive seniority in order finally to obtain a line-driver job will never be able to "catch up" to the seniority level of his contemporary who was not subject to discrimination.[27]  Accordingly, this continued, built-in disadvantage to

---

[25] Certain long-distance runs, for a variety of reasons, are more desirable than others.  The best runs are chosen by the line drivers at the top of the "board"—a list of drivers arranged in order of their bargaining-unit seniority.

[26] Both bargaining-unit seniority and company seniority rights are generally limited to service at one particular terminal, except as modified by the Southern Conference Area Over-the-Road Supplemental Agreement. See n. 10, *supra*.

[27] An example would be a Negro who was qualified to be a line driver in 1958 but who, because of his race, was assigned instead a job as a city driver, and is allowed to become a line driver only in 1971.  Because he loses his competitive seniority when he transfers jobs, he is forever junior

the prior discriminatee who transfers to a line-driver job was held to constitute a continuing violation of Title VII, for which both the employer and the union who jointly created and maintain the seniority system were liable.

The union, while acknowledging that the seniority system may in some sense perpetuate the effects of prior discrimination, asserts that the system is immunized from a finding of illegality by reason of § 703 (h) of Title VII, 42 U. S. C. § 2000e–2 (h), which provides in part:

> "Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system, . . . provided that such differences are not the result of an intention to discriminate because of race . . . or national origin . . . ."

It argues that the seniority system in this case is "bona fide" within the meaning of § 703 (h) when judged in light of its history, intent, application, and all of the circumstances under which it was created and is maintained. More specifically, the union claims that the central purpose of § 703 (h) is to ensure that mere perpetuation of *pre-Act* discrimination is not unlawful under Title VII. And, whether or not § 703 (h) immunizes the perpetuation of *post-Act* discrimination, the union claims that the seniority system in this litigation has no such effect. Its position in this Court, as has been its position throughout this litigation, is that the seniority system presents no hurdle to post-Act discrim-

---

to white line drivers hired between 1958 and 1970. The whites, rather than the Negro, will henceforth enjoy the preferable runs and the greater protection against layoff. Although the original discrimination occurred in 1958—before the effective date of Title VII—the seniority system operates to carry the effects of the earlier discrimination into the present.

inatees who seek retroactive seniority to the date they would have become line drivers but for the company's discrimination. Indeed, the union asserts that under its collective-bargaining agreements the union will itself take up the cause of the post-Act victim and attempt, through grievance procedures, to gain for him full "make whole" relief, including appropriate seniority.

The Government responds that a seniority system that perpetuates the effects of prior discrimination—pre-Act or post-Act—can never be "bona fide" under § 703 (h); at a minimum Title VII prohibits those applications of a seniority system that perpetuate the effects on incumbent employees of prior discriminatory job assignments.

The issues thus joined are open ones in this Court.[28] We considered § 703 (h) in *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, but there decided only that § 703 (h) does not bar the award of retroactive seniority to job applicants who seek relief from an employer's post-Act hiring discrimination. We stated that "the thrust of [§ 703 (h)] is directed toward

---

[28] Concededly, the view that § 703 (h) does not immunize seniority systems that perpetuate the effects of prior discrimination has much support. It was apparently first adopted in *Quarles* v. *Philip Morris, Inc.*, 279 F. Supp. 505 (ED Va.). The court there held that "a departmental seniority system *that has its genesis in racial discrimination* is not a *bona fide* seniority system." *Id.*, at 517 (first emphasis added). The *Quarles* view has since enjoyed wholesale adoption in the Courts of Appeals. See, *e. g., Local 189, United Papermakers & Paperworkers* v. *United States*, 416 F. 2d 980, 987–988 (CA5); *United States* v. *Sheet Metal Workers Local 36*, 416 F. 2d, at 133–134, n. 20; *United States* v. *Bethlehem Steel Corp.*, 446 F. 2d 652, 658–659 (CA2); *United States* v. *Chesapeake & Ohio R. Co.*, 471 F. 2d 582, 587–588 (CA4). Insofar as the result in *Quarles* and in the cases that followed it depended upon findings that the seniority systems were themselves "racially discriminatory" or had their "genesis in racial discrimination," 279 F. Supp., at 517, the decisions can be viewed as resting upon the proposition that a seniority system that perpetuates the effects of pre-Act discrimination cannot be bona fide if an intent to discriminate entered into its very adoption.

defining what is and what is not an illegal discriminatory practice in instances in which the post-Act operation of a seniority system is challenged as perpetuating the effects of discrimination occurring prior to the effective date of the Act." 424 U. S., at 761. Beyond noting the general purpose of the statute, however, we did not undertake the task of statutory construction required in this litigation.

(1)

Because the company discriminated both before and after the enactment of Title VII, the seniority system is said to have operated to perpetuate the effects of both pre- and post-Act discrimination. Post-Act discriminatees, however, may obtain full "make whole" relief, including retroactive seniority under *Franks* v. *Bowman, supra,* without attacking the legality of the seniority system as applied to them. *Franks* made clear and the union acknowledges that retroactive seniority may be awarded as relief from an employer's discriminatory hiring and assignment policies even if the seniority system agreement itself makes no provision for such relief.[29] 424 U. S., at 778–779. Here the Government has proved that the company engaged in a post-Act pattern of discriminatory hiring, assignment, transfer, and promotion policies. Any Negro or Spanish-surnamed American injured by those policies

---

[29] Article 38 of the National Master Freight Agreement between the company and the union in effect as of the date of the systemwide lawsuit provided:

"The Employer and the Union agree not to discriminate against any individual with respect to his hiring, compensation, terms or conditions of employment because of such individual's race, color, religion, sex, or national origin, nor will they limit, segregate or classify employees in any way to deprive any individual employee of employment opportunities because of his race, color, religion, sex, or national origin."

Any discrimination by the company would apparently be a "grievable" breach of this provision of the contract.

may receive all appropriate relief as a direct remedy for this discrimination.[30]

(2)

What remains for review is the judgment that the seniority system unlawfully perpetuated the effects of *pre-Act* discrimination. We must decide, in short, whether § 703 (h) validates otherwise bona fide seniority systems that afford no constructive seniority to victims discriminated against prior to the effective date of Title VII, and it is to that issue that we now turn.

The primary purpose of Title VII was "to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas Corp.* v. *Green,* 411 U. S., at 800.[31] See also *Albemarle Paper Co.* v. *Moody,* 422 U. S., at

---

[30] The legality of the seniority system insofar as it perpetuates post-Act discrimination nonetheless remains at issue in this case, in light of the injunction entered against the union. See *supra,* at 331. Our decision today in *United Air Lines, Inc.* v. *Evans, post,* p. 553, is largely dispositive of this issue. *Evans* holds that the operation of a seniority system is not unlawful under Title VII even though it perpetuates post-Act discrimination that has not been the subject of a timely charge by the discriminatee. Here, of course, the Government has sued to remedy the post-Act discrimination directly, and there is no claim that any relief would be time barred. But this is simply an additional reason not to hold the seniority system unlawful, since such a holding would in no way enlarge the relief to be awarded. See *Franks* v. *Bowman Transportation Co.,* 424 U. S. 747, 778–779. Section 703 (h) on its face immunizes all bona fide seniority systems, and does not distinguish between the perpetuation of pre- and post-Act discrimination.

[31] We also noted in *McDonnell Douglas:*

"There are societal as well as personal interests on both sides of this [employer-employee] equation. The broad, overriding interest, shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and racially neutral employment and personnel decisions. In the implementation of such decisions, it is abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise." 411 U. S., at 801.

417–418; *Alexander* v. *Gardner-Denver Co.,* 415 U. S. 36, 44; *Griggs* v. *Duke Power Co.,* 401 U. S., at 429–431. To achieve this purpose, Congress "proscribe[d] not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Id.,* at 431. Thus, the Court has repeatedly held that a prima facie Title VII violation may be established by policies or practices that are neutral on their face and in intent but that nonetheless discriminate in effect against a particular group. *General Electric Co.* v. *Gilbert,* 429 U. S. 125, 137; *Washington* v. *Davis,* 426 U. S., at 246–247; *Albemarle Paper Co.* v. *Moody, supra,* at 422, 425; *McDonnell Douglas Corp.* v. *Green, supra,* at 802 n. 14; *Griggs* v. *Duke Power Co., supra.*

One kind of practice "fair in form, but discriminatory in operation" is that which perpetuates the effects of prior discrimination.[32] As the Court held in *Griggs:* "Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." 401 U. S., at 430.

Were it not for § 703 (h), the seniority system in this case would seem to fall under the *Griggs* rationale. The heart of the system is its allocation of the choicest jobs, the greatest protection against layoffs, and other advantages to those employees who have been line drivers for the longest time. Where, because of the employer's prior intentional discrim-

---

[32] *Asbestos Workers Local 53* v. *Vogler,* 407 F. 2d 1047 (CA5), provides an apt illustration. There a union had a policy of excluding persons not related to present members by blood or marriage. When in 1966 suit was brought to challenge this policy, all of the union's members were white, largely as a result of pre-Act, intentional racial discrimination. The court observed: "While the nepotism requirement is applicable to black and white alike and is not on its face discriminatory, in a completely white union the present effect of its continued application is to forever deny to negroes and Mexican-Americans any real opportunity for membership." *Id.,* at 1054.

ination, the line drivers with the longest tenure are without exception white, the advantages of the seniority system flow disproportionately to them and away from Negro and Spanish-surnamed employees who might by now have enjoyed those advantages had not the employer discriminated before the passage of the Act. This disproportionate distribution of advantages does in a very real sense "operate to 'freeze' the status quo of prior discriminatory employment practices." But both the literal terms of § 703 (h) and the legislative history of Title VII demonstrate that Congress considered this very effect of many seniority systems and extended a measure of immunity to them.

Throughout the initial consideration of H. R. 7152, later enacted as the Civil Rights Act of 1964, critics of the bill charged that it would destroy existing seniority rights.[33] The consistent response of Title VII's congressional proponents and of the Justice Department was that seniority rights would not be affected, even where the employer had discriminated prior to the Act.[34] An interpretive memorandum placed in the Congressional Record by Senators Clark and Case stated:

"Title VII would have no effect on established seniority rights. Its effect is prospective and not retrospective. Thus, for example, *if a business has been discriminating in the past and as a result has an all-white working force, when the title comes into effect the employer's obligation would be simply to fill future vacancies on a nondiscriminatory basis.* He would not be obliged—or in-

---

[33] *E. g.,* H. R. Rep. No. 914, 88th Cong., 1st Sess., 65–66, 71 (1963) (minority report); 110 Cong. Rec. 486–488 (1964) (remarks of Sen. Hill); *id.,* at 2726 (remarks of Rep. Dowdy); *id.,* at 7091 (remarks of Sen. Stennis).

[34] In addition to the material cited in *Franks* v. *Bowman Transportation Co.,* 424 U. S., at 759–762, see 110 Cong. Rec. 1518 (1964) (remarks of Rep. Celler); *id.,* at 6549 (remarks of Sen. Humphrey); *id.,* at 6564 (remarks of Sen. Kuchel).

deed, permitted—to fire whites in order to hire Negroes, or to prefer Negroes for future vacancies, or, once Negroes are hired, to give them special seniority rights at the expense of the white workers hired earlier." 110 Cong. Rec. 7213 (1964) (emphasis added).[35]

A Justice Department statement concerning Title VII, placed in the Congressional Record by Senator Clark, voiced the same conclusion:

"Title VII would have no effect on seniority rights existing at the time it takes effect. If, for example, a collective bargaining contract provides that in the event of layoffs, those who were hired last must be laid off first, such a provision would not be affected in the least by title VII. *This would be true even in the case where owing to discrimination prior to the effective date of the title, white workers had more seniority than Negroes." Id.,* at 7207 (emphasis added).[36]

---

[35] Senators Clark and Case were the "bipartisan captains" responsible for Title VII during the Senate debate. Bipartisan captains were selected for each title of the Civil Rights Act by the leading proponents of the Act in both parties. They were responsible for explaining their title in detail, defending it, and leading discussion on it. See *id.,* at 6528 (remarks of Sen. Humphrey); Vaas, Title VII: Legislative History, 7 B. C. Ind. & Com. L. Rev. 431, 444–445 (1966).

[36] The full text of the statement is set out in *Franks* v. *Bowman Transportation Co., supra,* at 760 n. 16. Senator Clark also introduced a set of answers to questions propounded by Senator Dirksen, which included the following exchange:

"Question. Would the same situation prevail in respect to promotions, when that management function is governed by a labor contract calling for promotions on the basis of seniority? What of dismissals? Normally, labor contracts call for 'last hired, first fired.' If the last hired are Negroes, is the employer discriminating if his contract requires they be first fired and the remaining employees are white?

"Answer. Seniority rights are in no way affected by the bill. If under a 'last hired, first fired' agreement a Negro happens to be the 'last hired,' he can still be 'first fired' as long as it is done because of his status as 'last

While these statements were made before § 703 (h) was added to Title VII, they are authoritative indicators of that section's purpose. Section 703 (h) was enacted as part of the Mansfield-Dirksen compromise substitute bill that cleared the way for the passage of Title VII.[37] The drafters of the compromise bill stated that one of its principal goals was to resolve the ambiguities in the House-passed version of H. R. 7152. See, e. g., 110 Cong. Rec. 11935–11937 (1964) (remarks of Sen. Dirksen); id., at 12707 (remarks of Sen. Humphrey). As the debates indicate, one of those ambiguities concerned Title VII's impact on existing collectively bargained seniority rights. It is apparent that § 703 (h) was drafted with an eye toward meeting the earlier criticism on this issue with an explicit provision embodying the understanding and assurances of the Act's proponents, namely, that Title VII would not outlaw such differences in treatment among employees as flowed from a bona fide seniority system that allowed for full exercise of seniority accumulated before the effective date of the Act. It is inconceivable that § 703 (h), as part of a compromise bill, was intended to vitiate the earlier representations of the Act's supporters by increasing Title VII's impact on seniority systems. The statement of Senator Humphrey, noted in *Franks*, 424 U. S., at 761, confirms that the addition of § 703 (h) "merely clarifies [Title VII's] present intent and effect." 110 Cong. Rec. 12723 (1964).

In sum, the unmistakable purpose of § 703 (h) was to make clear that the routine application of a bona fide seniority system would not be unlawful under Title VII. As the legislative history shows, this was the intended result even where the employer's pre-Act discrimination resulted in whites having greater existing seniority rights than Negroes. Although a seniority system inevitably tends to perpetuate the effects of

hired' and not because of his race." 110 Cong. Rec. 7217 (1964). See *Franks, supra,* at 760 n. 16.

[37] See *Franks* v. *Bowman Transportation Co., supra,* at 761; Vaas, *supra,* n. 35, at 435.

pre-Act discrimination in such cases, the congressional judgment was that Title VII should not outlaw the use of existing seniority lists and thereby destroy or water down the vested seniority rights of employees simply because their employer had engaged in discrimination prior to the passage of the Act.

To be sure, § 703 (h) does not immunize all seniority systems. It refers only to "bona fide" systems, and a proviso requires that any differences in treatment not be "the result of an intention to discriminate because of race . . . or national origin . . . ." But our reading of the legislative history compels us to reject the Government's broad argument that no seniority system that tends to perpetuate pre-Act discrimination can be "bona fide." To accept the argument would require us to hold that a seniority system becomes illegal simply because it allows the full exercise of the pre-Act seniority rights of employees of a company that discriminated before Title VII was enacted. It would place an affirmative obligation on the parties to the seniority agreement to subordinate those rights in favor of the claims of pre-Act discriminatees without seniority. The consequence would be a perversion of the congressional purpose. We cannot accept the invitation to disembowel § 703 (h) by reading the words "bona fide" as the Government would have us do.[38] Accordingly, we hold that an otherwise neutral, legitimate seniority system does not become unlawful under Title VII simply because it may per-

---

[38] For the same reason, we reject the contention that the proviso in § 703 (h), which bars differences in treatment resulting from "an intention to discriminate," applies to any application of a seniority system that may perpetuate past discrimination. In this regard the language of the Justice Department memorandum introduced at the legislative hearings, see *supra*, at 351, is especially pertinent: "It is perfectly clear that when a worker is laid off or denied a chance for promotion because under established seniority rules he is 'low man on the totem pole' he is not being discriminated against because of his race. . . . Any differences in treatment based on established seniority rights would not be based on race and would not be forbidden by the title." 110 Cong. Rec. 7207 (1964).

petuate pre-Act discrimination. Congress did not intend to make it illegal for employees with vested seniority rights to continue to exercise those rights, even at the expense of pre-Act discriminatees.[39]

That conclusion is inescapable even in a case, such as this one, where the pre-Act discriminatees are incumbent employees who accumulated seniority in other bargaining units. Although there seems to be no explicit reference in the legislative history to pre-Act discriminatees already employed in less desirable jobs, there can be no rational basis for distinguishing their claims from those of persons initially denied *any* job but hired later with less seniority than they might have had in the absence of pre-Act discrimination.[40] We rejected any such

---

[39] The legislative history of the 1972 amendments to Title VII, summarized and discussed in *Franks*, 424 U. S., at 764–765, n. 21; *id.*, at 796–797, n. 18 (POWELL, J., concurring in part and dissenting in part), in no way points to a different result. As the discussion in *Franks* indicates, that history is itself susceptible of different readings. The few broad references to perpetuation of pre-Act discrimination or *"de facto* segregated job ladders," see, *e. g.,* S. Rep. No. 92–415, pp. 5, 9 (1971); H. R. Rep. No. 92–238, pp. 8, 17 (1971), did not address the specific issue presented by this case. And the assumption of the authors of the Conference Report that "the present case law as developed by the courts would continue to govern the applicability and construction of Title VII," see *Franks, supra,* at 765 n. 21, of course does not foreclose our consideration of that issue. More importantly, the section of Title VII that we construe here, § 703 (h), was enacted in 1964, not 1972. The views of members of a later Congress, concerning different sections of Title VII, enacted after this litigation was commenced, are entitled to little if any weight. It is the intent of the Congress that enacted § 703 (h) in 1964, unmistakable in this case, that controls.

[40] That Title VII did not proscribe the denial of fictional seniority to pre-Act discriminatees who got *no* job was recognized even in *Quarles* v. *Philip Morris, Inc.,* 279 F. Supp. 505 (ED Va.), and its progeny. *Quarles* stressed the fact that the references in the legislative history were to employment seniority rather than departmental seniority. *Id.,* at 516. In *Local 189, United Papermakers & Paperworkers* v. *United States,* 416 F. 2d 980 (CA5), another leading case in this area, the court observed:

distinction in *Franks,* finding that it had "no support anywhere in Title VII or its legislative history," 424 U. S., at 768. As discussed above, Congress in 1964 made clear that a seniority system is not unlawful because it honors employees' existing rights, even where the employer has engaged in pre-Act discriminatory hiring or promotion practices. It would be as contrary to that mandate to forbid the exercise of seniority rights with respect to discriminatees who held inferior jobs as with respect to later hired minority employees who previously were denied any job. If anything, the latter group is the more disadvantaged. As in *Franks,* " 'it would indeed be surprising if Congress gave a remedy for the one [group] which it denied for the other.' " *Ibid.,* quoting *Phelps Dodge Corp.* v. *NLRB,* 313 U. S. 177, 187.[41]

### (3)

The seniority system in this litigation is entirely bona fide. It applies equally to all races and ethnic groups. To the extent that it "locks" employees into non-line-driver jobs, it

---

"No doubt, Congress, to prevent 'reverse discrimination' meant to protect certain seniority rights that could not have existed but for previous racial discrimination. For example a Negro who had been rejected by an employer on racial grounds before passage of the Act could not, after being hired, claim to outrank whites who had been hired before him but after his original rejection, even though the Negro might have had senior status but for the past discrimination." *Id.,* at 994.

[41] In addition, there is no reason to suppose that Congress intended in 1964 to extend less protection to legitimate departmental seniority systems than to plantwide seniority systems. Then, as now, seniority was measured in a number of ways, including length of time with the employer, in a particular plant, in a department, in a job, or in a line of progression. See Aaron, Reflections on the Legal Nature and Enforceability of Seniority Rights, 75 Harv. L. Rev. 1532, 1534 (1962); Cooper & Sobol, Seniority and Testing under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv. L. Rev. 1598, 1602 (1969). The legislative history contains no suggestion that any one system was preferred.

does so for all. The city drivers and servicemen who are discouraged from transferring to line-driver jobs are not all Negroes or Spanish-surnamed Americans; to the contrary, the overwhelming majority are white. The placing of line drivers in a separate bargaining unit from other employees is rational, in accord with the industry practice, and consistent with National Labor Relation Board precedents.[42] It is conceded that the seniority system did not have its genesis in racial discrimination, and that it was negotiated and has been maintained free from any illegal purpose. In these circumstances, the single fact that the system extends no retroactive seniority to pre-Act discriminatees does not make it unlawful.

Because the seniority system was protected by § 703 (h), the union's conduct in agreeing to and maintaining the system did not violate Title VII. On remand, the District Court's injunction against the union must be vacated.[43]

### III

Our conclusion that the seniority system does not violate Title VII will necessarily affect the remedy granted to individual employees on remand of this litigation to the District Court. Those employees who suffered only pre-Act discrimination are not entitled to relief, and no person may

---

[42] See *Georgia Highway Express,* 150 N. L. R. B. 1649, 1651: "The Board has long held that local drivers and over-the-road drivers constitute separate appropriate units where they are shown to be clearly defined, homogeneous, and functionally distinct groups with separate interests which can effectively be represented separately for bargaining purposes. . . . In view of the different duties and functions, separate supervision, and different bases of payment, it is clear that the over-the-road drivers have divergent interests from those of the employees in the [city operations] unit . . . and should not be included in that unit."

[43] The union will properly remain in this litigation as a defendant so that full relief may be awarded the victims of the employer's post-Act discrimination. Fed. Rule Civ. Proc. 19 (a). See *EEOC* v. *MacMillan Bloedel Containers, Inc.,* 503 F. 2d 1086, 1095 (CA6).

be given retroactive seniority to a date earlier than the effective date of the Act. Several other questions relating to the appropriate measure of individual relief remain, however, for our consideration.

The petitioners argue generally that the trial court did not err in tailoring the remedy to the "degree of injury" suffered by each individual employee, and that the Court of Appeals' "qualification date" formula sweeps with too broad a brush by granting a remedy to employees who were not shown to be actual victims of unlawful discrimination. Specifically, the petitioners assert that no employee should be entitled to relief until the Government demonstrates that he was an actual victim of the company's discriminatory practices; that no employee who did not apply for a line-driver job should be granted retroactive competitive seniority; and that no employee should be elevated to a line-driver job ahead of any current line driver on layoff status. We consider each of these contentions separately.

## A

The petitioners' first contention is in substance that the Government's burden of proof in a pattern-or-practice case must be equivalent to that outlined in *McDonnell Douglas* v. *Green*. Since the Government introduced specific evidence of company discrimination against only some 40 employees, they argue that the District Court properly refused to award retroactive seniority to the remainder of the class of minority incumbent employees.

In *McDonnell Douglas* the Court considered "the order and allocation of proof in a private, non-class action challenging employment discrimination." 411 U. S., at 800. We held that an individual Title VII complainant must carry the initial burden of proof by establishing a prima facie case of racial discrimination. On the specific facts there involved, we concluded that this burden was met by showing that a

qualified applicant, who was a member of a racial minority group, had unsuccessfully sought a job for which there was a vacancy and for which the employer continued thereafter to seek applicants with similar qualifications. This initial showing justified the inference that the minority applicant was denied an employment opportunity for reasons prohibited by Title VII, and therefore shifted the burden to the employer to rebut that inference by offering some legitimate, nondiscriminatory reason for the rejection. *Id.*, at 802.

The company and union seize upon the *McDonnell Douglas* pattern as the *only* means of establishing a prima facie case of individual discrimination. Our decision in that case, however, did not purport to create an inflexible formulation. We expressly noted that "[t]he facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required from [a plaintiff] is not necessarily applicable in every respect to differing factual situations." *Id.*, at 802 n. 13. The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act.[44]

In *Franks* v. *Bowman Transportation Co.*, the Court applied

---

[44] The *McDonnell Douglas* case involved an individual complainant seeking to prove one instance of unlawful discrimination. An employer's isolated decision to reject an applicant who belongs to a racial minority does not show that the rejection was racially based. Although the *McDonnell Douglas* formula does not require direct proof of discrimination, it does demand that the alleged discriminatee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought. Elimination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one.

this principle in the context of a class action. The *Franks* plaintiffs proved, to the satisfaction of a District Court, that Bowman Transportation Co. "had engaged in a pattern of racial discrimination in various company policies, including the hiring, transfer, and discharge of employees." 424 U. S., at 751. Despite this showing, the trial court denied seniority relief to certain members of the class of discriminatees because not every individual had shown that he was qualified for the job he sought and that a vacancy had been available. We held that the trial court had erred in placing this burden on the individual plaintiffs. By "demonstrating the existence of a discriminatory hiring pattern and practice" the plaintiffs had made out a prima facie case of discrimination against the individual class members; the burden therefore shifted to the employer "to prove that individuals who reapply were not in fact victims of previous hiring discrimination." *Id.*, at 772. The *Franks* case thus illustrates another means by which a Title VII plaintiff's initial burden of proof can be met. The class there alleged a broad-based policy of employment discrimination; upon proof of that allegation there were reasonable grounds to infer that individual hiring decisions were made in pursuit of the discriminatory policy and to require the employer to come forth with evidence dispelling that inference.[45]

---

[45] The holding in *Franks* that proof of a discriminatory pattern and practice creates a rebuttable presumption in favor of individual relief is consistent with the manner in which presumptions are created generally. Presumptions shifting the burden of proof are often created to reflect judicial evaluations of probabilities and to conform with a party's superior access to the proof. See C. McCormick, Law of Evidence §§ 337, 343 (2d ed. 1972); James, Burdens of Proof, 47 Va. L. Rev. 51, 61 (1961). See also *Keyes* v. *School Dist. No. 1*, 413 U. S. 189, 208–209. These factors were present in *Franks*. Although the prima facie case did not conclusively demonstrate that all of the employer's decisions were part of the proved discriminatory pattern and practice, it did create a greater likelihood that any single decision was a component of the overall pattern. Moreover, the

Although not all class actions will necessarily follow the *Franks* model, the nature of a pattern-or-practice suit brings it squarely within our holding in *Franks*. The plaintiff in a pattern-or-practice action is the Government, and its initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers. See *supra*, at 336, and n. 16. At the initial, "liability" stage of a pattern-or-practice suit the Government is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed. The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the Government's proof is either inaccurate or insignificant. An employer might show, for example, that the claimed discriminatory pattern is a product of pre-Act hiring rather than unlawful post-Act discrimination, or that during the period it is alleged to have pursued a discriminatory policy it made too few employment decisions to justify the inference that it had engaged in a regular practice of discrimination.[46]

---

finding of a pattern or practice changed the position of the employer to that of a proved wrongdoer. Finally, the employer was in the best position to show why any individual employee was denied an employment opportunity. Insofar as the reasons related to available vacancies or the employer's evaluation of the applicant's qualifications, the company's records were the most relevant items of proof. If the refusal to hire was based on other factors, the employer and its agents knew best what those factors were and the extent to which they influenced the decisionmaking process.

[46] The employer's defense must, of course, be designed to meet the prima facie case of the Government. We do not mean to suggest that there are any particular limits on the type of evidence an employer may use. The point is that at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking. While a pattern might be demonstrated by examining the discrete decisions of which it is composed, the Govern-

If an employer fails to rebut the inference that arises from the Government's prima facie case, a trial court may then conclude that a violation has occurred and determine the appropriate remedy. Without any further evidence from the Government, a court's finding of a pattern or practice justifies an award of prospective relief. Such relief might take the form of an injunctive order against continuation of the discriminatory practice, an order that the employer keep records of its future employment decisions and file periodic reports with the court, or any other order "necessary to ensure the full enjoyment of the rights" protected by Title VII.[47]

When the Government seeks individual relief for the victims of the discriminatory practice, a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief. The petitioners' contention in this case is that if the Government has not, in the course of proving a pattern or practice, already brought forth specific evidence that each individual was discriminatorily denied an employment opportunity, it must carry that burden at the second, "remedial" stage of trial. That basic contention was rejected in the *Franks* case. As was true of the particular facts in *Franks*, and as is typical of Title VII pattern-or-practice suits, the question of individual relief does not arise until it has been proved that the employer has followed an employment policy of unlawful discrimination. The force of that proof does not dissipate at the remedial stage

ment's suits have more commonly involved proof of the expected result of a regularly followed discriminatory policy. In such cases the employer's burden is to provide a nondiscriminatory explanation for the apparently discriminatory result. See n. 20, *supra,* and cases cited therein.

[47] The federal courts have freely exercised their broad equitable discretion to devise prospective relief designed to assure that employers found to be in violation of § 707 (a) eliminate their discriminatory practices and the effects therefrom. See, *e. g.,* cases cited in n. 51, *infra.* In this case prospective relief was incorporated in the parties' consent decree. See n. 4, *supra.*

of the trial. The employer cannot, therefore, claim that there is no reason to believe that its individual employment decisions were discriminatorily based; it has already been shown to have maintained a policy of discriminatory decisionmaking.

The proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy. The Government need only show that an alleged individual discriminatee unsuccessfully applied for a job [48] and therefore was a potential victim of the proved discrimination. As in *Franks*, the burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons. See 424 U. S., at 773 n. 32.

In Part II–A, *supra*, we have held that the District Court and Court of Appeals were not in error in finding that the Government had proved a systemwide pattern and practice of racial and ethnic discrimination on the part of the company. On remand, therefore, every post-Act minority group applicant [49] for a line-driver position will be presumptively entitled to relief, subject to a showing by the company that its earlier refusal to place the applicant in a line-driver job was not based on its policy of discrimination.[50]

B

The Court of Appeals' "qualification date" formula for relief did not distinguish between incumbent employees who

[48] Nonapplicants are discussed in Part III–B, *infra*.

[49] Employees who initially applied for line-driver jobs and were hired in other jobs before the effective date of the Act, and who did not later apply for transfer to line-driver jobs, are part of the group of nonapplicants discussed *infra*.

[50] Any nondiscriminatory justification offered by the company will be subject to further evidence by the Government that the purported reason for an applicant's rejection was in fact a pretext for unlawful discrimination. *McDonnell Douglas Corp.* v. *Green*, 411 U. S., at 804–806.

had applied for line-driver jobs and those who had not. The appellate court held that where there has been a showing of classwide discriminatory practices coupled with a seniority system that perpetuates the effects of that discrimination, an individual member of the class need not show that he unsuccessfully applied for the position from which the class had been excluded. In support of its award of relief to all nonapplicants, the Court suggested that "as a practical matter . . . a member of the affected class may well have concluded that an application for transfer to an all White position such as [line driver] was not worth the candle." 517 F. 2d, at 320.

The company contends that a grant of retroactive seniority to these nonapplicants is inconsistent with the make-whole purpose of a Title VII remedy and impermissibly will require the company to give preferential treatment to employees solely because of their race. The thrust of the company's contention is that unless a minority-group employee actually applied for a line-driver job, either for initial hire or for transfer, he has suffered no injury from whatever discrimination might have been involved in the refusal of such jobs to those who actually applied for them.

The Government argues in response that there should be no "immutable rule" that nonapplicants are nonvictims, and contends that a determination whether nonapplicants have suffered from unlawful discrimination will necessarily vary depending on the circumstances of each particular case. The Government further asserts that under the specific facts of this case, the Court of Appeals correctly determined that all qualified nonapplicants were likely victims and were therefore presumptively entitled to relief.

The question whether seniority relief may be awarded to nonapplicants was left open by our decision in *Franks*, since the class at issue in that case was limited to "identifiable applicants who were denied employment . . . after the effective date . . . of Title VII." 424 U. S., at 750. We now

decide that an incumbent employee's failure to apply for a job is not an inexorable bar to an award of retroactive seniority. Individual nonapplicants must be given an opportunity to undertake their difficult task of proving that they should be treated as applicants and therefore are presumptively entitled to relief accordingly.

(1)

Analysis of this problem must begin with the premise that the scope of a district court's remedial powers under Title VII is determined by the purposes of the Act. *Albemarle Paper Co.* v. *Moody,* 422 U. S., at 417. In *Griggs* v. *Duke Power Co.,* and again in *Albemarle,* the Court noted that a primary objective of Title VII is prophylactic: to achieve equal employment opportunity and to remove the barriers that have operated to favor white male employees over other employees. 401 U. S., at 429–430; 422 U. S., at 417. The prospect of retroactive relief for victims of discrimination serves this purpose by providing the " 'spur or catalyst which causes employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges' " of their discriminatory practices. *Id.,* at 417–418. An equally important purpose of the Act is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Id.,* at 418. In determining the specific remedies to be afforded, a district court is "to fashion such relief as the particular circumstances of a case may require to effect restitution." *Franks,* 424 U. S., at 764.

Thus, the Court has held that the purpose of Congress in vesting broad equitable powers in Title VII courts was "to make possible the 'fashion[ing] [of] the most complete relief possible,' " and that the district courts have " 'not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.' " *Albemarle,*

*supra,* at 421, 418.   More specifically, in *Franks* we decided that a court must ordinarily award a seniority remedy unless there exist reasons for denying relief " 'which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination . . . and making persons whole for injuries suffered.' "   424 U. S., at 771, quoting *Albemarle, supra,* at 421.

Measured against these standards, the company's assertion that a person who has not actually applied for a job can *never* be awarded seniority relief cannot prevail.   The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who were expressly denied a requested employment opportunity.   A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection.

If an employer should announce his policy of discrimination by a sign reading "Whites Only" on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs.   The same message can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices— by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups.[51]   When a person's

---

[51] The far-ranging effects of subtle discriminatory practices have not escaped the scrutiny of the federal courts, which have provided relief from practices designed to discourage job applications from minority-group members.   See, *e. g., Franks* v. *Bowman Transportation Co.,* 495 F. 2d 398, 418–419 (CA5) (public recruitment and advertising), rev'd on other grounds, 424 U. S. 747; *Carter* v. *Gallagher,* 452 F. 2d 315, 319 (CA8)

desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.

In cases decided under the National Labor Relations Act, the model for Title VII's remedial provisions, *Albemarle, supra,* at 419; *Franks, supra,* at 769, the National Labor Relations Board, and the courts in enforcing its orders, have recognized that the failure to submit a futile application does not bar an award of relief to a person claiming that he was denied employment because of union affiliation or activity. In *NLRB* v. *Nevada Consolidated Copper Corp.,* 316 U. S. 105, this Court enforced an order of the Board directing an employer to hire, with retroactive benefits, former employees who had not applied for newly available jobs because of the employer's well-known policy of refusing to hire union members. See *In re Nevada Consolidated Copper Corp.,* 26 N. L. R. B. 1182, 1208, 1231. Similarly, when an application would have been no more than a vain gesture in light of employer discrimination, the Courts of Appeals have enforced Board orders reinstating striking workers despite the failure of individual strikers to apply for reinstatement when the strike ended. *E. g., NLRB* v. *Park Edge Sheridan Meats, Inc.,* 323 F. 2d 956 (CA2); *NLRB* v. *Valley Die Cast Corp.,* 303 F. 2d 64 (CA6); *Eagle-Picher Mining & Smelting Co.* v. *NLRB,* 119 F. 2d 903 (CA8). See also *Piasecki Aircraft Corp.* v. *NLRB,* 280 F. 2d 575 (CA3); *NLRB* v. *Anchor Rome Mills,*

---

(recruitment); *United States* v. *Jacksonville Terminal Co.,* 451 F. 2d, at 458 (posting of job vacancies and job qualification requirements); *United States* v. *Local No. 86, Ironworkers,* 315 F. Supp. 1202, 1238, 1245–1246 (WD Wash.) (dissemination of information), aff'd, 443 F. 2d 544 (CA9). While these measures may be effective in preventing the deterrence of future applicants, they afford no relief to those persons who in the past desired jobs but were intimidated and discouraged by employment discrimination.

228 F. 2d 775 (CA5); *NLRB* v. *Lummus Co.*, 210 F. 2d 377 (CA5). Consistent with the NLRA model, several Courts of Appeals have held in Title VII cases that a nonapplicant can be a victim of unlawful discrimination entitled to make-whole relief when an application would have been a useless act serving only to confirm a discriminatee's knowledge that the job he wanted was unavailable to him. *Acha* v. *Beame*, 531 F. 2d 648, 656 (CA2); *Hairston* v. *McLean Trucking Co.*, 520 F. 2d 226, 231–233 (CA4); *Bing* v. *Roadway Express, Inc.*, 485 F. 2d 441, 451 (CA5); *United States* v. *N. L. Industries, Inc.*, 479 F. 2d 354, 369 (CA8).

The denial of Title VII relief on the ground that the claimant had not formally applied for the job could exclude from the Act's coverage the victims of the most entrenched forms of discrimination. Victims of gross and pervasive discrimination could be denied relief precisely because the unlawful practices had been so successful as totally to deter job applications from members of minority groups. A *per se* prohibition of relief to nonapplicants could thus put beyond the reach of equity the most invidious effects of employment discrimination—those that extend to the very hope of self-realization. Such a *per se* limitation on the equitable powers granted to courts by Title VII would be manifestly inconsistent with the "historic purpose of equity to 'secur[e] complete justice' " and with the duty of courts in Title VII cases " 'to render a decree which will so far as possible eliminate the discriminatory effects of the past.' " *Albemarle Paper Co.* v. *Moody*, 422 U. S., at 418.

(2)

To conclude that a person's failure to submit an application for a job does not inevitably and forever foreclose his entitlement to seniority relief under Title VII is a far cry, however, from holding that nonapplicants are always entitled to such relief. A nonapplicant must show that he was a potential victim of unlawful discrimination. Because he is necessarily

claiming that he was deterred from applying for the job by the employer's discriminatory practices, his is the not always easy burden of proving that he would have applied for the job had it not been for those practices. Cf. *Mt. Healthy City Board of Education* v. *Doyle,* 429 U. S. 274. When this burden is met, the nonapplicant is in a position analogous to that of an applicant and is entitled to the presumption discussed in Part III–A, *supra.*

The Government contends that the evidence it presented in this case at the liability stage of the trial identified all non-applicants as victims of unlawful discrimination "with a fair degree of specificity," and that the Court of Appeals' determination that qualified nonapplicants are presumptively entitled to an award of seniority should accordingly be affirmed. In support of this contention the Government cites its proof of an extended pattern and practice of discrimination as evidence that an application from a minority employee for a line-driver job would have been a vain and useless act. It further argues that since the class of nonapplicant discriminatees is limited to incumbent employees, it is likely that every class member was aware of the futility of seeking a line-driver job and was therefore deterred from filing both an initial and a followup application.[52]

---

[52] The limitation to incumbent employees is also said to serve the same function that actual job applications served in *Franks:* providing a means of distinguishing members of the excluded minority group from minority members of the public at large. While it is true that incumbency in this case and actual applications in *Franks* both serve to narrow what might otherwise be an impossible task, the statuses of nonincumbent applicant and nonapplicant incumbent differ substantially. The refused applicants in *Franks* had been denied an opportunity they clearly sought, and the only issue to be resolved was whether the denial was pursuant to a proved discriminatory practice. Resolution of the nonapplicant's claim, however, requires two distinct determinations: that he would have applied but for discrimination and that he would have been discriminatorily rejected had he applied. The mere fact of incumbency does not resolve

We cannot agree. While the scope and duration of the company's discriminatory policy can leave little doubt that the futility of seeking line-driver jobs was communicated to the company's minority employees, that in itself is insufficient. The known prospect of discriminatory rejection shows only that employees who wanted line-driving jobs may have been deterred from applying for them. It does not show which of the nonapplicants actually wanted such jobs, or which possessed the requisite qualifications.[53] There are differences between city- and line-driving jobs.[54] for example, but the desirability of the latter is not so self-evident as to warrant a conclusion that all employees would prefer to be line drivers if given a free choice.[55] Indeed, a substantial number of white

the first issue, although it may tend to support a nonapplicant's claim to the extent that it shows he was willing and competent to work as a driver, that he was familiar with the tasks of line drivers, etc. An incumbent's claim that he would have applied for a line-driver job would certainly be more superficially plausible than a similar claim by a member of the general public who may never have worked in the trucking industry or heard of the company prior to suit.

[53] Inasmuch as the purpose of the nonapplicant's burden of proof will be to establish that his status is similar to that of the applicant, he must bear the burden of coming forward with the basic information about his qualifications that he would have presented in an application. As in *Franks,* and in accord with Part III-A, *supra,* the burden then will be on the employer to show that the nonapplicant was nevertheless not a victim of discrimination. For example, the employer might show that there were other, more qualified persons who would have been chosen for a particular vacancy, or that the nonapplicant's stated qualifications were insufficient. See *Franks,* 424 U. S., at 773 n. 32.

[54] Of the employees for whom the Government sought transfer to line-driving jobs, nearly one-third held city-driver positions.

[55] The company's line drivers generally earned more annually than its city drivers, but the difference varied from under $1,000 to more than $5,000 depending on the terminal and the year. In 1971 city drivers at two California terminals, "LOS" and San Francisco, earned substantially more than the line drivers at those terminals. In addition to earnings, line drivers have the advantage of not being required to load and unload their

city drivers who were not subjected to the company's discriminatory practices were apparently content to retain their city jobs.[56]

In order to fill this evidentiary gap, the Government argues that a nonapplicant's current willingness to transfer into a line-driver position confirms his past desire for the job. An employee's response to the court-ordered notice of his entitlement to relief [57] demonstrates, according to this argument, that

---

trucks. City drivers, however, have regular working hours, are not required to spend extended periods away from home and family, and do not face the hazards of long-distance driving at high speeds. As the Government acknowledged at argument, the jobs are in some sense "parallel"— some may prefer one job and some may prefer another.

The District Court found generally that line-driver jobs "are considered the most desirable of the driving jobs." That finding is not challenged here, and we see no reason to disturb it. We observe only that the differences between city and line driving were not such that it can be said with confidence that all minority employees free from the threat of discriminatory treatment would have chosen to give up city for line driving.

[56] In addition to the futility of application, the Court of Appeals seems to have relied on the minority employees' accumulated seniority in non-line-driver positions in concluding that nonapplicants had been unlawfully deterred from applying. See 517 F. 2d, at 318, 320. The Government adopts that theory here, arguing that a nonapplicant who has accrued time at the company would be unlikely to have applied for transfer because he would have had to forfeit all of his competitive seniority and the job security that went with it. In view of our conclusion in Part II–B, *supra,* this argument detracts from rather than supports a nonapplicant's entitlement to relief. To the extent that an incumbent was deterred from applying by his desire to retain his competitive seniority, he simply did not want a line-driver job requiring him to start at the bottom of the "board." Those nonapplicants who did not apply for transfer because they were unwilling to give up their previously acquired seniority suffered only from a lawful deterrent imposed on all employees regardless of race or ethnicity. The nonapplicant's remedy in such cases is limited solely to the relief, if any, to which he may be entitled because of the discrimination he encountered at a time when he wanted to take a starting line-driver job.

[57] The District Court's final order required that the company notify each minority employee of the relief he was entitled to claim. The employee was

the employee would have sought a line-driver job when he first became qualified to fill one, but for his knowledge of the company's discriminatory policy.

This assumption falls short of satisfying the appropriate burden of proof. An employee who transfers into a line-driver unit is normally placed at the bottom of the seniority "board." He is thus in jeopardy of being laid off and must, at best, suffer through an initial period of bidding on only the least desirable runs. See *supra*, at 343–344, and n. 25. Non-applicants who chose to accept the appellate court's *post hoc* invitation, however, would enter the line-driving unit with retroactive seniority dating from the time they were first qualified. A willingness to accept the job security and bidding power afforded by retroactive seniority says little about what choice an employee would have made had he previously been given the opportunity freely to choose a starting line-driver job. While it may be true that many of the nonapplicant employees desired and would have applied for line-driver jobs but for their knowledge of the company's policy of discrimination, the Government must carry its burden of proof, with respect to each specific individual, at the remedial hearings to be conducted by the District Court on remand.[58]

## C

The task remaining for the District Court on remand will not be a simple one. Initially, the court will have to make a substantial number of individual determinations in deciding which of the minority employees were actual victims

---

then required to indicate, within 60 days, his willingness to accept the relief. Under the decision of the Court of Appeals, the relief would be qualification-date seniority.

[58] While the most convincing proof would be some overt act such as a pre-Act application for a line-driver job, the District Court may find evidence of an employee's informal inquiry, expression of interest, or even unexpressed desire credible and convincing. The question is a factual one for determination by the trial judge.

of the company's discriminatory practices. After the victims have been identified, the court must, as nearly as possible, " 'recreate the conditions and relationships that would have been had there been no' " unlawful discrimination. *Franks,* 424 U. S., at 769. This process of recreating the past will necessarily involve a degree of approximation and imprecision. Because the class of victims may include some who did not apply for line-driver jobs as well as those who did, and because more than one minority employee may have been denied each line-driver vacancy, the court will be required to balance the equities of each minority employee's situation in allocating the limited number of vacancies that were discriminatorily refused to class members.

Moreover, after the victims have been identified and their rightful place determined, the District Court will again be faced with the delicate task of adjusting the remedial interests of discriminatees and the legitimate expectations of other employees innocent of any wrongdoing. In the prejudgment consent decree, see n. 4, *supra,* the company and the Government agreed that minority employees would assume line-driver positions that had been discriminatorily denied to them by exercising a first-priority right to job vacancies at the company's terminals. The decree did not determine what constituted a vacancy, but in its final order the trial court defined "vacancy" to exclude any position that became available while there were laid-off employees awaiting an opportunity to return to work. Employees on layoff were given a preference to fill whatever openings might occur at their terminals during a three-year period after they were laid off.[59]

---

[59] Paragraph 9 (a) of the trial court's final order provided:

"A 'vacancy' as used in this Order, shall include any opening which is caused by the transfer or promotion to a position outside the bargaining unit, death, resignation or final discharge of an incumbent, or by an increase in operations or business where, ordinarily, additional employees would be put to work. A vacancy shall not exist where there are laid off employees on the seniority roster where the opening occurs. Such laid

The Court of Appeals rejected the preference and held that all but "purely temporary" vacancies were to be filled according to an employee's seniority, whether as a member of the class

off employees shall have a preference to fill such laid off positions when these again become open without competition from the individuals granted relief in this case. However, if such layoff continues for three consecutive years the position will be deemed as 'vacant' with the right of all concerned to compete for the position, using their respective seniority dates, including those provided for in this Order."

The trial court's use of a three-year recall right is apparently derived from provisions in the collective-bargaining agreements. Article 5 of the National Master Freight Agreement (NMFA) establishes the seniority rights of employees covered by the Agreement. Under Art. 5, "[s]eniority rights for employees shall prevail . . . . Seniority shall only be broken by discharge, voluntary quit, [or] more than a three (3) year layoff." § 1. As is evident, the three-year layoff provision in the NMFA determines only when an employee shall lose *all* of his accumulated seniority; it does not determine either the order of layoff or the order of recall. Subject to other terms of the NMFA, Art. 2, § 2, "[t]he extent to which seniority shall be applied as well as the methods and procedures of such application" are left to the Supplemental Agreements. Art. 5, § 1. The Southern Conference Area Over-the-Road Supplemental Agreement, covering line drivers in the Southern Conference, also provides for a complete loss of seniority rights after a three-year layoff, Art. 42, § 1, and further provides that in the event of a reduction in force "the last employee hired shall be laid off first and when the force is again increased, the employees are to be returned to work in the reverse order in which they were laid off," Art. 42, § 3.

This order of layoff and recall, however, is limited by the NMFA in at least two situations involving an influx of employees from outside a terminal. Art. 5, § 3 (a) (1) (merger with a solvent company), § 5 (b) (2) (branch closing with transfer of operations to another branch). In these cases the NMFA provides for "dovetailing" the seniority rights of active and laid-off employees at the two facilities involved. *Ibid.;* see also NMFA, Art 15 (honoring Military Selective Service Act of 1967). The NMFA also recognizes that "questions of accrual, interpretation or application of seniority rights may arise which are not covered by the general rules set forth," and provides a procedure for resolution of unforeseen seniority problems. Art. 5, § 7. Presumably § 7 applies to persons claiming discriminatory denial of jobs and seniority in violation of Art. 38,

discriminated against or as an incumbent line driver on layoff. 517 F. 2d, at 322–323.

As their final contention concerning the remedy, the company and the union argue that the trial court correctly made the adjustment between the competing interests of discriminatees and other employees by granting a preference to laid-off employees, and that the Court of Appeals erred in disturbing it. The petitioners therefore urge the reinstatement of that part of the trial court's final order pertaining to the rate at which victims will assume their rightful places in the line-driver hierarchy.[60]

Although not directly controlled by the Act,[61] the extent to

---

which prohibits discrimination in hiring as well as classification of employees so as to deprive them of employment opportunities on account of race or national origin. See n. 29, *supra*. The District Court apparently did not consider these provisions when it determined the recall rights of employees on layoff.

[60] In their briefs the petitioners also challenge the trial court's modification of the interterminal transfer rights of line drivers in the Southern Conference. See n. 10, *supra*. This question was not presented in either petition for certiorari and therefore is not properly before us. This Court's Rule 23 (1)(c). Our disposition of the claim that is presented, however, will permit the trial court to reconsider any part of the balance it struck in dealing with this issue.

[61] The petitioners argue that to permit a victim of discrimination to use his rightful-place seniority to bid on a line-driver job before the recall of all employees on layoff would amount to a racial or ethnic preference in violation of § 703 (j) of the Act. Section 703 (j) provides no support for this argument. It provides only that Title VII does not require an employer to grant preferential treatment to any group in order to rectify an imbalance between the composition of the employer's work force and the makeup of the population at large. See n. 20, *supra*. To allow identifiable-victims of unlawful discrimination to participate in a layoff recall is not the kind of "preference" prohibited by § 703 (j). If a discriminatee is ultimately allowed to secure a position before a laid-off line driver, a question we do not now decide, he will do so because of the bidding power inherent in his rightful-place seniority, and not because of a preference

which the legitimate expectations of nonvictim employees should determine when victims are restored to their rightful place is limited by basic principles of equity. In devising and implementing remedies under Title VII, no less than in formulating any equitable decree, a court must draw on the "qualities of mercy and practicality [that] have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." *Hecht Co.* v. *Bowles,* 321 U. S. 321, 329–330. Cf. *Phelps Dodge Corp.* v. *NLRB,* 313 U. S., at 195–196, modifying 113 F. 2d 202 (CA2); 19 N. L. R. B. 547, 600; *Franks,* 424 U. S., at 798–799 (POWELL, J., concurring in part and dissenting in part). Especially when immediate implementation of an equitable remedy threatens to impinge upon the expectations of innocent parties, the courts must "look to the practical realities and necessities inescapably involved in reconciling competing interests," in order to determine the "special blend of what is necessary, what is fair, and what is workable." *Lemon* v. *Kurtzman,* 411 U. S. 192, 200–201 (opinion of BURGER, C. J.).

Because of the limited facts now in the record, we decline to strike the balance in this Court. The District Court did not explain why it subordinated the interests of class members to the contractual recall expectations of other employees on layoff. When it made that determination, however, it was considering a class of more than 400 minority employees, all of whom had been granted some preference in filling line-driver vacancies. The overwhelming majority of these were in the District Court's subclass three, composed of those employees with respect to whom neither the Government nor the company had presented any specific evidence on the question of unlawful discrimination. Thus, when the court considered the problem of what constituted a line-driver "vacancy"

---

based on race. See *Franks,* 424 U. S., at 792 (POWELL, J., concurring in part and dissenting in part).

to be offered to class members, it may have been influenced by the relatively small number of proved victims and the large number of minority employees about whom it had no information. On the other hand, the Court of Appeals redefined "vacancy" in the context of what it believed to be a class of more than 400 employees who had actually suffered from discrimination at the behest of both the company and the union, and its determination may well have been influenced by that understanding. For the reasons discussed in this opinion, neither court's concept was completely valid.

After the evidentiary hearings to be conducted on remand, both the size and the composition of the class of minority employees entitled to relief may be altered substantially. Until those hearings have been conducted and both the number of identifiable victims and the consequent extent of necessary relief have been determined, it is not possible to evaluate abstract claims concerning the equitable balance that should be struck between the statutory rights of victims and the contractual rights of nonvictim employees. That determination is best left, in the first instance, to the sound equitable discretion of the trial court.[62] See *Franks* v. *Bowman Transportation Co., supra,* at 779; *Albemarle Paper Co.* v. *Moody,* 422 U. S., at 416. We observe only that when the court exercises its discretion in dealing with the problem of laid-off employees in light of the facts developed at the hearings on remand, it should clearly state its reasons so that meaningful review may be had on appeal. See *Franks, supra,* at 774; *Albemarle Paper Co.* v. *Moody, supra,* at 421 n. 14.

For all the reasons we have discussed, the judgment of the Court of Appeals is vacated, and the cases are remanded to the

---

[62] Other factors, such as the number of victims, the number of non-victim employees affected and the alternatives available to them, and the economic circumstances of the industry may also be relevant in the exercise of the District Court's discretion. See *Franks, supra,* at 796 n. 17 (POWELL, J., concurring in part and dissenting in part).

District Court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, concurring in part and dissenting in part.

I agree with the Court that the United States proved that petitioner T. I. M. E.-D. C. was guilty of a pattern or practice of discriminating against blacks and Spanish-surnamed Americans in hiring line drivers. I also agree that incumbent minority-group employees who show that they applied for a line-driving job or that they would have applied but for the company's unlawful acts are presumptively entitled to the full measure of relief set forth in our decision last Term in *Franks* v. *Bowman Transportation Co.,* 424 U. S. 747 (1976).[1] But I do not agree that Title VII permits petitioners to treat Negro and Spanish-surnamed line drivers differently from other drivers who were hired by the company at the same time simply because the former drivers were prevented by the company from acquiring seniority over the road. I therefore dissent

---

[1] In stating that the task nonapplicants face in proving that they should be treated like applicants is "difficult," *ante,* at 364, I understand the Court simply to be addressing the facts of this case. There may well be cases in which the jobs that the nonapplicants seek are so clearly more desirable than their present jobs that proving that but for the employer's discrimination the nonapplicants previously would have applied will be anything but difficult.

Even in the present case, however, I believe the Court unnecessarily adds to the nonapplicants' burden. While I agree that proof of a nonapplicant's current willingness to accept a line-driver job is not dispositive of the question of whether the company's discrimination deterred the nonapplicant from applying in the past, I do not agree that current willingness "says little," see *ante,* at 371, about past willingness. In my view, we would do well to leave questions of this sort concerning the weight to be given particular pieces of evidence to the district courts, rather than attempting to resolve them through overly broad and ultimately meaningless generalizations.

from that aspect of the Court's holding, and from the limitations on the scope of the remedy that follow from it.

As the Court quite properly acknowledges, *ante,* at 349–350, the seniority provision at issue here clearly would violate Title VII absent § 703 (h), 42 U. S. C. § 2000e–2 (h), which exempts at least some seniority systems from the reach of the Act. Title VII prohibits an employer from "classify[ing] his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin." 42 U. S. C. § 2000e–2 (a)(2) (1970 ed., Supp. V). "Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained *if they operate to 'freeze' the status quo of prior discriminatory employment practices." Griggs* v. *Duke Power Co.,* 401 U. S. 424, 430 (1971) (emphasis added). Petitioners' seniority system does precisely that: it awards the choicest jobs and other benefits to those possessing a credential—seniority—which, due to past discrimination, blacks and Spanish-surnamed employees were prevented from acquiring. Consequently, "[e]very time a Negro worker hired under the old segregated system bids against a white worker in his job slot, the old racial classification reasserts itself, and the Negro suffers anew for his employer's previous bias." *Local 189, United Papermakers & Paperworkers* v. *United States,* 416 F. 2d 980, 988 (CA5 1969) (Wisdom, J.), cert. denied, 397 U. S. 919 (1970).

As the Court also concedes, with a touch of understatement, "the view that § 703 (h) does not immunize seniority systems that perpetuate the effects of prior discrimination has much support." *Ante,* at 346 n. 28. Without a single dissent, six Courts of Appeals have so held in over 30 cases,[2] and two

---

[2] *Acha* v. *Beame,* 531 F. 2d 648 (CA2 1976); *United States* v. *Bethlehem Steel Corp.,* 446 F. 2d 652 (CA2 1971); *Nance* v. *Union Carbide Corp.,* 540 F. 2d 718 (CA4 1976), cert. pending, Nos. 76–824, 76–838; *Patterson*

other Courts of Appeals have indicated their agreement, also without dissent.[3] In an unbroken line of cases, the Equal Employment Opportunity Commission has reached the same

v. *American Tobacco Co.*, 535 F. 2d 257 (CA4), cert. denied, 429 U. S. 920 (1976); *Russell* v. *American Tobacco Co.*, 528 F. 2d 357 (CA4 1975), cert. denied, 425 U. S. 935 (1976); *Hairston* v. *McLean Trucking Co.*, 520 F. 2d 226 (CA4 1975); *United States* v. *Chesapeake & Ohio R. Co.*, 471 F. 2d 582 (CA4 1972), cert. denied *sub nom. Railroad Trainmen* v. *United States*, 411 U. S. 939 (1973); *Robinson* v. *Lorillard Corp.*, 444 F. 2d 791 (CA4), cert. dismissed, 404 U. S. 1006 (1971); *Griggs* v. *Duke Power Co.*, 420 F. 2d 1225 (CA4 1970), rev'd on other grounds, 401 U. S. 424 (1971); *Swint* v. *Pullman-Standard*, 539 F. 2d 77 (CA5 1976); *Sagers* v. *Yellow Freight System*, 529 F. 2d 721 (CA5 1976); *Sabdla* v. *Western Gillette, Inc.*, 516 F. 2d 1251 (CA5 1975), cert. pending, Nos. 75–788, 76–1060; *Gamble* v. *Birmingham Southern R. Co.*, 514 F. 2d 678 (CA5 1975); *Resendis* v. *Lee Way Motor Freight, Inc.*, 505 F. 2d 69 (CA5 1974); *Herrera* v. *Yellow Freight System, Inc.*, 505 F. 2d 66 (CA5 1974); *Carey* v. *Greyhound Bus Co.*, 500 F. 2d 1372 (CA5 1974); *Pettway* v. *American Cast Iron Pipe Co.*, 494 F. 2d 211 (CA5 1974); *Johnson* v. *Goodyear Tire & Rubber Co.*, 491 F. 2d 1364 (CA5 1974); *Bing* v. *Roadway Express, Inc.*, 485 F. 2d 441 (CA5 1973); *United States* v. *Georgia Power Co.*, 474 F. 2d 906 (CA5 1973); *United States* v. *Jacksonville Terminal Co.*, 451 F. 2d 418 (CA5 1971), cert. denied, 406 U. S. 906 (1972); *Long* v. *Georgia Kraft Co.*, 450 F. 2d 557 (CA5 1971); *Taylor* v. *Armco Steel Corp.*, 429 F. 2d 498 (CA5 1970); *Local 189, United Papermakers & Paperworkers* v. *United States*, 416 F. 2d 980 (CA5 1969), cert. denied, 397 U. S. 919 (1970); *EEOC* v. *Detroit Edison Co.*, 515 F. 2d 301 (CA6 1975), cert. pending, Nos. 75–220, 75–221, 75–239, 75–393; *Palmer* v. *General Mills, Inc.*, 513 F. 2d 1040 (CA6 1975); *Head* v. *Timken Roller Bearing Co.*, 486 F. 2d 870 (CA6 1973); *Bailey* v. *American Tobacco Co.*, 462 F. 2d 160 (CA6 1972); *Rogers* v. *International Paper Co.*, 510 F. 2d 1340 (CA8), summarily vacated and remanded, 423 U. S. 809 (1975); *United States* v. *N. L. Industries, Inc.*, 479 F. 2d 354 (CA8 1973); *Gibson* v. *Longshoremen*, 543 F. 2d 1259 (CA9 1976); *United States* v. *Navajo Freight Lines, Inc.*, 525 F. 2d 1318 (CA9 1975).

The leading case in this line is a District Court decision, *Quarles* v. *Philip Morris, Inc.*, 279 F. Supp. 505 (ED Va. 1968).

[3] *Bowe* v. *Colgate, Palmolive Co.*, 489 F. 2d 896 (CA7 1973); *Jones* v. *Lee Way Motor Freight, Inc.*, 431 F. 2d 245 (CA10 1970), cert. denied, 401 U. S. 954 (1971).

I agree with the Court, *ante*, at 346 n. 28, that the results in a large

conclusion.[4] And the overwhelming weight of scholarly opinion is in accord.[5] Yet for the second time this Term, see *General Electric Co.* v. *Gilbert*, 429 U. S. 125 (1976), a majority of this Court overturns the unanimous conclusion of the Courts of Appeals and the EEOC concerning the scope of Title VII. Once again, I respectfully disagree.

---

number of the *Quarles* line of cases can survive today's decision. That the instant seniority system "is rational, in accord with the industry practice, . . . consistent with NLRB precedents[,] . . . did not have its genesis in racial discrimination, and . . . was negotiated and has been maintained free from any illegal purpose," *ante,* at 356, distinguishes the facts of this case from those in many of the prior decisions.

[4] CCH Empl. Prac. Guide (1976) ¶¶ 6481, 6448, 6441, 6400, 6399, 6395, 6382; CCH EEOC Decisions (1973) ¶¶ 6373, 6370, 6366, 6365, 6355, 6334, 6313, 6272, 6223, 6217, 6214, 6211, 6197, 6195, 6188, 6176, 6169, 6044.

[5] Blumrosen, Seniority & Equal Employment Opportunity: A Glimmer of Hope, 23 Rutgers L. Rev. 268 (1969); Cooper & Sobol, Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv. L. Rev. 1598 (1969); Fine: Plant Seniority and Minority Employees: Title VII's Effect on Layoffs, 47 U. Colo. L. Rev. 73 (1975); Gould, Seniority and the Black Worker: Reflections on Quarles and its Implications, 47 Texas L. Rev. 1039 (1969); Poplin, Fair Employment in a Depressed Economy: The Layoff Problem, 23 UCLA L. Rev. 177 (1975); S. Ross, Reconciling Plant Seniority with Affirmative Action and Anti-Discrimination, in New York University, Twenty-Eighth Annual Conference on Labor 231 (1976); Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv. L. Rev. 1109, 1157–1164 (1971); Comment, Last Hired, First Fired Seniority, Layoffs, and Title VII: Questions of Liability and Remedy, 11 Colum. J. Law & Soc. Prob. 343 (1975); Note, The Problem of Last Hired, First Fired: Retroactive Seniority as a Remedy Under Title VII, 9 Ga. L. Rev. 611 (1975); Note, Last Hired, First Fired Layoffs and Title VII, 88 Harv. L. Rev. 1544 (1975); Note, Title VII, Seniority Discrimination, and the Incumbent Negro, 80 Harv. L. Rev. 1260 (1967); Comment, Title VII and Seniority Systems: Back to the Foot of the Line? 64 Ky. L. Rev. 114 (1975); Comment, Layoffs and Title VII: The Conflict Between Seniority and Equal Employment Opportunities, 1975 Wis. L. Rev. 791; 1969 Duke L. J. 1091; 46 N. C. L. Rev. 891 (1968).

I

Initially, it is important to bear in mind that Title VII is a remedial statute designed to eradicate certain invidious employment practices. The evils against which it is aimed are defined broadly: "to fail . . . to hire or to discharge . . . *or otherwise to discriminate* . . . with respect to . . . compensation, terms, conditions, or privileges of employment," and "to limit, segregate, or classify . . . *in any way* which would deprive *or tend to deprive* any individual of employment opportunities *or otherwise adversely affect his status.*" 42 U. S. C. § 2000e–2 (a) (1970 ed., Supp. V) (emphasis added). Section 703 (h) carves out an exemption from these broad prohibitions. Accordingly, under longstanding principles of statutory construction, the Act should "be given a liberal interpretation . . . [and] exemptions from its sweep should be narrowed and limited to effect the remedy intended." *Piedmont & Northern R. Co.* v. *ICC,* 286 U. S. 299, 311–312 (1932); see also *Spokane & Inland R. Co.* v. *United States,* 241 U. S. 344, 350 (1916); *United States* v. *Dickson,* 15 Pet. 141, 165 (1841) (Story, J.). Unless a seniority system that perpetuates discrimination falls "plainly and unmistakably within [the] terms and spirit" of § 703 (h), *A. H. Phillips, Inc.* v. *Walling,* 324 U. S. 490, 493 (1945), the system should be deemed unprotected. I submit that whatever else may be true of the section, its applicability to systems that perpetuate past discrimination is not "plainly and unmistakably" clear.

The language of § 703 (h) provides anything but clear support for the Court's holding. That section provides, in pertinent part:

"[I]t shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions or privileges of employment pursuant to a bona fide seniority . . . system . . . *provided that such differences are not the result of an intention to*

> *discriminate because of race, color, religion, sex, or national origin . . . ."* (Emphasis added.)

In this case, however, the different "privileges of employment" for Negroes and Spanish-surnamed Americans, on the one hand, and for all others, on the other hand, produced by petitioners' seniority system are precisely the result of prior, intentional discrimination in assigning jobs; but for that discrimination, Negroes and Spanish-surnamed Americans would not be disadvantaged by the system. Thus, if the proviso is read literally, the instant case falls squarely within it, thereby rendering § 703 (h) inapplicable. To avoid this result the Court is compelled to reconstruct the proviso to read: provided that such a seniority system "did not have its genesis in racial discrimination, and that it was negotiated and has been maintained free from any illegal purpose." *Ante*, at 356.

There are no explicit statements in the legislative history of Title VII that warrant this radical reconstruction of the proviso. The three documents placed in the Congressional Record by Senator Clark concerning seniority all were written many weeks before the Mansfield-Dirksen amendment containing § 703 (h) was introduced. Accordingly, they do not specifically discuss the meaning of the proviso.[6] More im-

---

[6] The three documents, quoted in full in *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 759–761, nn. 15–16 (1976), and in substantial part in today's decision, *ante*, at 350–351, and n. 36, are (1) the Clark-Case Interpretive Memorandum, 110 Cong. Rec. 7212–7215 (1964); (2) the Justice Department Reply to Arguments Made by Senator Hill, *id.*, at 7207; and (3) Senator Clark's Response to the Dirksen Memorandum, *id.*, at 7216–7218. They were all placed in the Congressional Record of April 8, 1964, but were not read aloud during the debates. The Mansfield-Dirksen amendment was presented by Senator Dirksen on May 26, 1964. *Id.*, at 11926.

A few general statements also were made during the course of the debates concerning Title VII's impact on seniority, but these statements add nothing to the analysis contained in the documents. See *id.*, at 1518 (Rep. Cellar); *id.*, at 6549, 11848 (Sen. Humphrey); *id.*, at 6563–6564

portantly, none of the documents addresses the general problem of seniority systems that perpetuate discrimination. Not surprisingly, Congress simply did not think of such subtleties in enacting a comprehensive, pathbreaking Civil Rights Act.[7] To my mind, this is dispositive. Absent unambiguous statutory language or an authoritative statement in the legislative history legalizing seniority systems that continue past wrongs, I do not see how it can be said that the § 703 (h) exemption "plainly and unmistakably" applies.

## II

Even if I were to agree that this case properly can be decided on the basis of inferences as to Congress' intent, I still could not accept the Court's holding. In my view, the legislative history of the 1964 Civil Rights Act does not support the conclusion that Congress intended to legalize seniority systems that perpetuate discrimination, and administrative and legislative developments since 1964 positively refute that conclusion.

## A

The Court's decision to uphold seniority systems that perpetuate post-Act discrimination—that is, seniority systems that treat Negroes and Spanish-surnamed Americans who become line drivers as new employees even though, after the effective date of Title VII, these persons were discriminatorily assigned to city-driver jobs where they accumulated seniority—is explained in a single footnote. *Ante,* at 348 n. 30. That footnote relies almost entirely on *United Air Lines, Inc.*

---

(Sen. Kuchel); *id.,* at 9113 (Sen. Keating); *id.,* at 15893 (Rep. McCulloch).

[7] In amending Title VII in 1972, Congress acknowledged its own prior naiveté:

"In 1964, employment discrimination tended to be viewed as a series of isolated and distinguishable events, for the most part due to ill-will on the part of some identifiable individual or organization. . . . Experience has shown this view to be false." S. Rep. No. 92–415, p. 5 (1971).

See H. R. Rep. No. 92–238, p. 8 (1971).

v. *Evans, post,* p. 553. But like the instant decision, *Evans* is devoid of any analysis of the legislative history of § 703 (h); it simply asserts its conclusion in a single paragraph. For the Court to base its decision here on the strength of *Evans* is sheer bootstrapping.

Had the Court objectively examined the legislative history, it would have been compelled to reach the opposite conclusion. As we stated just last Term, "it is apparent that the thrust of [§ 703 (h)] is directed toward defining what is and what is not an illegal discriminatory practice in instances in which the post-Act operation of a seniority system is challenged as perpetuating the effects of discrimination *occurring prior to the effective date of the Act.*" [8] *Franks* v. *Bowman Transportation Co.,* 424 U. S., at 761 (emphasis added). Congress was concerned with seniority expectations that had developed prior to the enactment of Title VII, not with expectations arising thereafter to the extent that those expectations were dependent on whites benefiting from unlawful discrimination. Thus, the paragraph of the Clark-Case Interpretive Memorandum dealing with seniority systems begins:

> "Title VII would have no effect on established seniority rights. *Its effect is prospective and not retrospective.*" 110 Cong. Rec. 7213 (1964) (emphasis added).

Similarly, the Justice Department memorandum that Senator Clark introduced explains:

> "Title VII would have no effect on seniority rights existing *at the time it takes effect.* If, for example a collective bargaining contract provides that in the event of layoffs, those who were hired last must be laid off first, such a provision would not be affected . . . by title VII. This

---

[8] This understanding of § 703 (h) underlies *Franks'* holding that constructive seniority is the presumptively correct remedy for discriminatory refusals to hire, even though awarding such seniority necessarily disrupts the expectations of other employees.

would be true even in the case where *owing to discrimination prior to the effective date of the title,* white workers had more seniority than Negroes . . . . Any differences in treatment based on *established* seniority rights would not be based on race and would not be forbidden by the title." *Id.,* at 7207 (emphasis added).

Finally, Senator Clark's prepared answers to questions propounded by Senator Dirksen stated:

"Question. If an employer is directed to abolish his employment list because of discrimination what happens to seniority?

"Answer. *The bill is not retroactive,* and it will not require an employer to change existing seniority lists." *Id.,* at 7217 (emphasis added).

For the Court to ignore this history while reaching a conclusion contrary to it is little short of remarkable.

### B

The legislative history of § 703 (h) admittedly affords somewhat stronger support for the Court's conclusion with respect to seniority systems that perpetuate pre-Act discrimination— that is, seniority systems that treat Negroes and Spanish-surnamed Americans who become line drivers as new employees even though these persons were discriminatorily assigned to city-driver jobs where they accumulated seniority before the effective date of Title VII. In enacting § 703 (h), Congress intended to extend at least some protection to seniority expectations that had developed prior to the effective date of the Act. But the legislative history is very clear that the only threat to these expectations that Congress was seeking to avert was nonremedial, fictional seniority. Congress did not want minority group members who were hired after the effective date of the Act to be given superseniority simply because they were members of minority groups, nor did it want the use of seniority to be invalidated whenever it had a disparate

impact on newly hired minority employees. These are the evils—and the only evils—that the opponents of Title VII raised[9] and that the Clark-Case Interpretive Memorandum addressed.[10] As the Court acknowledges, "there seems to be no explicit reference in the legislative history to pre-Act discriminatees already employed in less desirable jobs." *Ante,* at 354.

Our task, then, assuming still that the case properly can be decided on the basis of imputed legislative intent, is "to put to ourselves the question, which choice is it the more likely that Congress would have made," *Burnet* v. *Guggenheim,* 288

---

[9] The most detailed attack on Title VII's effect on seniority rights was voiced in the minority report to the House Judiciary Committee Report, H. R. Rep. No. 914, 88th Cong., 1st Sess. (1963):

*"The provisions of this act grant the power to destroy union seniority. . . . [T]he extent of actions which would be taken to destroy the seniority system is unknown and unknowable.*

". . . Under the power granted in this bill, if a carpenters' hiring hall, say, had 20 men awaiting call, the first 10 in seniority being white carpenters, the union could be forced to pass them over in favor of carpenters beneath them in seniority, but of the stipulated race." *Id.,* at 71 (emphasis in original).

The Senate opponents of the bill who discussed its effects on workers generally followed this line, although the principal argument advanced in the Senate was that Title VII would require preferential hiring of minorities. See 110 Cong. Rec. 487 (1964) (Sen. Hill); *id.,* at 7091 (Sen. Stennis); *id.,* at 7878 (Sen. Russell).

[10] The Clark-Case Memorandum states:

"Title VII would have no effect on established seniority rights. . . . Thus, for example, if a business has been discriminating in the past and as a result has an all-white working force, when the title comes into effect the employer's obligation would be simply to fill future vacancies on a nondiscriminatory basis. He would not be obliged—or indeed, permitted—to fire whites in order to hire Negroes, or to prefer Negroes for future vacancies, or, once Negroes are hired, to give them special seniority rights at the expense of the white workers." *Id.,* at 7213.

The remaining documents, see n. 6, *supra,* while phrased more generally, are entirely consistent with the focus of Senators Clark and Case.

U. S. 280, 285 (1933) (Cardozo, J.), had it focused on the problem: would it have validated or invalidated seniority systems that perpetuate pre-Act discrimination? To answer that question, the devastating impact of today's holding validating such systems must be fully understood. Prior to 1965 blacks and Spanish-surnamed Americans who were able to find employment were assigned the lowest paid, most menial jobs in many industries throughout the Nation but especially in the South. In many factories, blacks were hired as laborers while whites were trained and given skilled positions; [11] in the transportation industry blacks could only become porters; [12] and in steel plants blacks were assigned to the coke ovens and blasting furnaces, "the hotter and dirtier" places of employment.[13] The Court holds, in essence, that while after 1965 these incumbent employees are entitled to an equal opportunity to advance to more desirable jobs, to take advantage of that opportunity they must pay a price: they must surrender the seniority they have accumulated in their old jobs. For many, the price will be too high, and they will be locked into their previous positions.[14] Even those willing to pay the price will

---

[11] E. g., Johnson v. Goodyear Tire & Rubber Co., 491 F. 2d 1364 (CA5 1974); United States v. N. L. Industries, Inc., 479 F. 2d 354 (CA8 1973); Griggs v. Duke Power Co., 420 F. 2d 1225 (CA4 1970).

[12] E. g., Carey v. Greyhound Bus Co., 500 F. 2d 1372 (CA5 1974); United States v. Jacksonville Terminal Co., 451 F. 2d 418 (CA5 1971).

[13] United States v. Bethlehem Steel Corp., 446 F. 2d, at 655.

[14] This "lock-in" effect explains why, contrary to the Court's assertion, ante, at 354, there is a "rational basis for distinguishing . . . claims [of persons already employed in less desirable jobs] from those of persons initially denied any job." Although denying constructive seniority to the latter group will prevent them from assuming the position they would have occupied but for the pre-Act discrimination, it will not deter them from moving into higher paying jobs.

In comparing incumbent employees with pre-Act discriminatees who were refused jobs, however, the Court assumes that § 703 (h) must mean that the latter group need not be given constructive seniority if they are later hired. The only clear effect of § 703 (h), however, is to prevent

have to reconcile themselves to being forever behind subsequently hired whites who were not discriminatorily assigned. Thus equal opportunity will remain a distant dream for all incumbent employees.

I am aware of nothing in the legislative history of the 1964 Civil Rights Act to suggest that if Congress had focused on this fact it nonetheless would have decided to write off an entire generation of minority-group employees. Nor can I believe that the Congress that enacted Title VII would have agreed to postpone for one generation the achievement of economic equality. The backers of that Title viewed economic equality as both a practical necessity and a moral imperative.[15] They were well aware of the corrosive impact employment discrimination has on its victims, and on society generally.[16] They sought, therefore, "to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens"; *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792, 800 (1973); see also *Griggs* v. *Duke Power Co.,* 401 U. S., at 429–431; *Alexander* v. *Gardner-Denver Co.,* 415 U. S. 36, 44 (1974); and "to make persons whole for injuries suffered on account of unlawful employment discrimination," *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 418 (1975). In

---

persons who were *not* discriminated against from obtaining special seniority rights because they are members of minority groups. See *supra,* at 385–386, and n. 10. Although it is true, as the Court notes, *ante,* at 354–355, n. 40, that in *Quarles* and *United Papermakers* the courts concluded that persons refused jobs prior to the Act need not be given fictional seniority, the EEOC, CCH EEOC Decisions (1973) ¶ 6217, and several commentators, *e. g.,* Cooper & Sobol, *supra,* n. 5; Note, *supra,* n. 5, 88 Harv. L. Rev., at 1544, have rejected this conclusion, and more recent decisions have questioned it, *e. g., Watkins* v. *Steel Workers,* 516 F. 2d 41 (CA5 1975).

[15] See, *e. g.,* 110 Cong. Rec. 6547 (1964) (remarks of Sen. Humphrey); *id.,* at 6562 (remarks of Sen. Kuchel); *id.,* at 7203–7204 (remarks of Sen. Clark); H. R. Rep. No. 914, Pt. 2, 88th Cong., 1st Sess., 26–29 (1963).

[16] See sources cited in n. 15, *supra.*

short, Congress wanted to enable black workers to assume their rightful place in society.

It is, of course, true that Congress was not willing to invalidate seniority systems on a wholesale basis in pursuit of that goal.[17] But the United States, as the plaintiff suing on behalf of the incumbent minority group employees here, does not seek to overturn petitioners' seniority system. It seeks only to have the "time actually worked in [minority group] jobs [recognized] as the equal of [the majority group's] time," *Local 189, United Papermakers & Paperworkers* v. *United States,* 416 F. 2d, at 995, within the existing seniority system. Admittedly, such recognition would impinge on the seniority expectations white employees had developed prior to the effective date of the Act. But in enacting Title VII, Congress manifested a willingness to do precisely that. For example, the Clark-Case Interpretive Memorandum, see n. 6, *supra,* makes clear that Title VII prohibits unions and employers from using discriminatory waiting lists, developed prior to the effective date of the Title, in making selections for jobs or training programs after that date. 110 Cong. Rec. 7213 (1964). Such a prohibition necessarily would disrupt the expectations of those on the lists. More generally, the very fact that Congress made Title VII effective shortly after its enactment demonstrates that expectations developed prior to passage of the Act were not considered sacrosanct, since Title VII's general ban on employment discrimination inevitably interfered with the pre-existing expectations of whites who anticipated benefiting from continued discrimination. Thus I am in complete agreement with Judge Butzner's conclusion

---

[17] As one commentator has stated:

"[T]he statute conflicts with itself. While on the one hand Congress did wish to protect established seniority rights, on the other it intended to expedite black integration into the economic mainstream and to end, once and for all, the *de facto* discrimination which replaced slavery at the end of the Civil War." Poplin, *supra,* n. 5, at 191.

in his seminal decision in *Quarles* v. *Philip Morris, Inc.*, 279 F. Supp. 505, 516 (ED Va. 1968): "It is . . . apparent that Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the Act."[18]

## C

If the legislative history of § 703 (h) leaves any doubt concerning the section's applicability to seniority systems that perpetuate either pre- or post-Act discrimination, that doubt is entirely dispelled by two subsequent developments. The Court all but ignores both developments; I submit they are critical.

First, in more than a score of decisions beginning at least as early as 1969, the Equal Employment Opportunity Commission has consistently held that seniority systems that perpetuate prior discrimination are unlawful.[19] While the Court may have retreated, see *General Electric Co.* v. *Gilbert*, 429 U. S. 125, 141–142 (1976), from its prior view that the interpretations of the EEOC are " 'entitled to great deference,' " *Albemarle Paper Co.* v. *Moody, supra,* at 431, quoting *Griggs*

---

[18] See also Gould, *supra,* n. 5, at 1042:

"If Congress intended to bring into being an integrated work force, . . . and not merely to create a paper plan meaningless to Negro workers, the only acceptable legislative intent on past discrimination is one that requires unions and employers to root out the past discrimination embodied in presently nondiscriminatory seniority arrangements so that black and white workers have equal job advancement rights."

[19] See cases cited in n. 4, *supra.*

The National Labor Relations Board has reached a similar conclusion in interpreting the National Labor Relations Act, 29 U. S. C. § 151 *et seq.* In *Local 269, Electrical Workers*, 149 N. L. R. B. 769 (1964), enforced, 357 F. 2d 51 (CA3 1966), the Board held that a union hiring hall commits present acts of discrimination when it makes referrals based on experience if, in the past, the union has denied nonunion members the opportunity to develop experience. See also *Houston Maritime Assn.*, 168 N. L. R. B. 615 (1967), enforcement denied, 426 F. 2d 584 (CA5 1970).

v. *Duke Power Co., supra,* at 434, I have not. Before I would sweep aside the EEOC's consistent interpretation of the statute it administers, I would require " 'compelling indications that it is wrong.' " *Espinoza* v. *Farah Mfg. Co.,* 414 U. S. 86, 94–95 (1973), quoting *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 381 (1969). I find no such indications in the Court's opinion.

Second, in 1972 Congress enacted the Equal Employment Opportunity Act of 1972, Pub. L. 92–261, 86 Stat. 103, amending Title VII. In so doing, Congress made very clear that it approved of the lower court decisions invalidating seniority systems that perpetuate discrimination. That Congress was aware of such cases is evident from the Senate and House Committee Reports which cite the two leading decisions, as well as several prominent law review articles. S. Rep. No. 92–415, p. 5 n. 1 (1971); H. R. Rep. No. 92–238, p. 8 n. 2 (1971). Although Congress took action with respect to other lower court opinions with which it was dissatisfied,[20] it made no attempt to overrule the seniority cases. To the contrary, both the Senate and House Reports expressed approval of the "perpetuation principle" as applied to seniority systems[21] and

---

[20] For example, the 1972 Act added to the definitional section of Title VII, 42 U. S. C. § 2000e (1970 ed., Supp. V), a new subsection (j) defining "religion" to include "religious observance and practice, as well as belief." This subsection was added "to provide the statutory basis for EEOC to formulate guidelines on discrimination because of religion such as those challenged in *Dewey* v. *Reynolds Metal Company,* 429 F. 2d [324] (6th Cir. 1970), *Affirmed by an equally divided court,* 402 U. S. 689 (1971)." 118 Cong. Rec. 7167 (1972) (Section-by-Section Analysis of H. R. 1746, the Equal Employment Opportunity Act of 1972, prepared by Sens. Williams and Javits). *Dewey* had questioned the authority of the EEOC to define "religion" to encompass religious practices. *Dewey* v. *Reynolds Metals Co.,* 429 F. 2d 324, 331 n. 1, 334–335 (CA6 1970).

[21] After acknowledging the naive assumptions of the 1964 Civil Rights Act, see n. 7, *supra,* both Committee Reports went on to state:

"Employment discrimination as 'viewed today is a far more complex and pervasive phenomenon. Experts familiar with the subject now gen-

invoked the principle to justify the Committees' recommenda-
tions to extend Title VII's coverage to state and local gov-
ernment employees,[22] and to expand the powers of the
EEOC.[23] Moreover, the Section-by-Section Analysis of the

erally describe the problem in terms of 'systems' and 'effects' rather than
simply intentional wrongs, and the literature on the subject is replete with
discussions of, for example, the mechanics of seniority and lines of pro-
gression, [and] perpetuation of the present effect of pre-act discriminatory
practices through various institutional devices . . . . In short, the problem
is one whose resolution in many instances requires not only expert assist-
ance, but also the technical perception that the problem exists in the first
instance, and that the system complained of is unlawful." S. Rep. No.
92–415, p. 5 (1971).

See H. R. Rep. No. 92–238, p. 8 (1971).

In addition, in discussing "pattern or practice" suits and the recom-
mendation to transfer the power to bring them to the EEOC, the House
Report singled out several seniority cases, including *United Papermakers,*
as examples of suits that "have contributed significantly to the Federal
effort to combat employment discrimination." H. R. Rep. No. 92–238,
*supra,* at 13, and n. 4.

It is difficult to imagine how Congress could have better "address[ed]
the specific issue presented by this case," *ante,* at 354 n. 39, than by
referring to "the mechanics of seniority . . . [and] perpetuation of the
present effect of pre-act discriminatory practices" and by citing *Quarles*
and *United Papermakers.*

[22] Both Reports stated that state and local governments had discrim-
inated in the past and that "the existence of discrimination is perpetuated
by both institutional and overt discriminatory practices . . . [such as]
*de facto* segregated job ladders." S. Rep. No. 92–415, *supra,* at 10; H. R.
Rep. No. 92–238, *supra,* at 17. The same points were made in the debate
in the House and Senate. 118 Cong. Rec. 1815 (1972) (remarks of Sen.
Williams); 117 Cong. Rec. 31961 (1971) (remarks of Rep. Perkins).

[23] The Senate Report stated:

"It is expected that through the administrative process, the Commission
will continue to define and develop the approaches to handling serious
problems of discrimination that are involved in the area of employ-
ment . . . (including seniority systems)." S. Rep. No. 92–415, *supra,*
at 19.

The House Report argued:

"Administrative tribunals are better equipped to handle the complicated

Conference Committee bill, which was prepared and placed in the Congressional Record by the floor managers of the bill, stated in "language that could hardly be more explicit," *Franks* v. *Bowman Transportation Co.,* 424 U. S., at 765 n. 21, that, "in any areas where a specific contrary intention is not indicated, it was assumed that the present case law . . . would continue to govern the applicability and construction of Title VII." 118 Cong. Rec. 7166, 7564 (1972). And perhaps most important, in explaining the section of the 1972 Act that empowers the EEOC "to prevent any person from engaging in any unlawful employment practice as set forth in section 2000e–2 or 2000e–3," 42 U. S. C. § 2000e–5 (a) (1970 ed., Supp. V), the Section-by-Section Analysis declared:

> "The unlawful employment practices encompassed by sections 703 and 704 which were enumerated in 1964 by the original Act, *and as defined and expanded by the courts,* remain in effect." 118 Cong. Rec. 7167, 7564 (1972) (emphasis added).[24]

We have repeatedly held: "When several acts of Congress are passed touching the same subject matter, subsequent legislation may be considered to assist in the interpretation of prior legislation upon the same subject." *Tiger* v. *Western Investment Co.,* 221 U. S. 286, 309 (1911); see *NLRB* v. *Bell Aerospace Co.,* 416 U. S. 267, 275 (1974) (subsequent legisla-

---

issues involved in employment discrimination cases. . . . Issues that have perplexed courts include plant-wide restructuring of pay-scales and progression lines, seniority rosters and testing." H. R. Rep. No. 92–238, *supra,* at 10.

[24] By enacting a new section defining the EEOC's powers with reference to §§ 703 and 704 of the 1964 Act, Congress in 1972 effectively re-enacted those sections, and the judicial gloss that had been placed upon them. See 2A C. Sands, Sutherland's Statutes and Statutory Construction § 49.10 (1973) and cases cited; cf. *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 414 n. 8 (1975) (finding that re-enactment in 1972 of backpay provision of 1964 Act "ratified" Courts of Appeals decisions awarding backpay to unnamed class members who had not filed charges with the EEOC).

tion entitled to "significant weight"); *Red Lion Broadcasting Co. v. FCC,* 395 U. S., at 380; *United States v. Stafoff,* 260 U. S. 477, 480 (1923) (Holmes, J.); *New York & Norfolk R. Co. v. Peninsula Produce Exchange,* 240 U. S. 34, 39 (1916) (Hughes, J.); *United States v. Weeks,* 5 Cranch 1, 8 (1809). Earlier this Term, we implicitly followed this canon in using a statute passed in 1976 to conclude that the Administrative Procedure Act, 5 U. S. C. §§ 701–706, enacted in 1946, was not intended as an independent grant of jurisdiction to the federal courts. *Califano v. Sanders,* 430 U. S. 99 (1977). The canon is particularly applicable here for two reasons. First, because there is no explicit legislative history discussing seniority systems that perpetuate discrimination, we are required to " '[seize] every thing from which aid can be derived . . . ,' " *Brown v. GSA,* 425 U. S. 820, 825 (1976), quoting, *United States v. Fisher,* 2 Cranch 358, 386 (1805), if we are to reconstruct congressional intent. Second, because petitioners' seniority system was readopted in collective-bargaining agreements signed after the 1972 Act took effect, any retroactivity problems that ordinarily inhere in using a later Act to interpret an earlier one are not present here. Cf. *Stockdale v. Insurance Cos.,* 20 Wall. 323, 331–332 (1874). Thus, the Court's bald assertion that the intent of the Congress that enacted the 1972 Act is "entitled to little if any weight," *ante,* at 354 n. 39, in construing § 703 (h) is contrary to both principle and precedent.

Only last Term, we concluded that the legislative materials reviewed above "completely [answer] the argument that Congress somehow intended seniority relief to be less available" than backpay as a remedy for discrimination. *Franks v. Bowman Transportation Co., supra,* at 765 n. 21. If anything, the materials provide an even more complete answer to the argument that Congress somehow intended to immunize seniority systems that perpetuate past discrimination. To the extent that today's decision grants immunity to such systems, I respectfully dissent.