586 F.Supp. 954 (1984)
Helen SANDERSON, Plaintiff,
v.
ST. LOUIS UNIVERSITY, Defendant.
No. 83-1323C(1).
United States District Court, E.D. Missouri, E.D.
June 29, 1984.
*955 L. Steven Goldblatt, St. Louis, Mo., for plaintiff.
Robert W. Stewart, St. Louis, Mo., for defendant.

MEMORANDUM
NANGLE, Chief Judge.
Plaintiff Helen Sanderson (hereinafter "Sanderson") brought this action against defendant St. Louis University (hereinafter "SLU") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq. Ms. Sanderson, a security guard for SLU, alleges that she was discriminated against on the basis of her race, black, and sex, female. She alleges that SLU denied her a light duty or sedentary job assignment for her medical condition of pregnancy while extending other light duty or sedentary job assignments to other white or male security guards when they were temporarily disabled. SLU contends that it did not treat Sanderson disparately and that, if it did, it was for a legitimate, non-discriminatory reason.
This case was tried to this Court sitting without a jury. This Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 52.

A. FINDINGS OF FACT
1. Sanderson is a black female, citizen of the United States.
2. SLU is an employer within the meaning of Section 701(b) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq., and operates an institution of higher learning within the City of St. Louis, Missouri.
3. Sanderson was hired by SLU on or about September 1, 1979, as a security officer, level two, within defendant's Department of Security. Helen Sanderson was promoted to security guard, level one, in June, 1980.
4. Sanderson became pregnant in April of 1982. She informed SLU in May of 1982.
5. On May 30, 1982, Sanderson was assigned to the Communications and Dispatch Desk of the Security Department's South Campus. On this day, Sanderson incurred a 7½% permanent partial disability when she injured her back assisting a wounded prisoner to the defendant's emergency room.
6. On or about June 4, 1982, Sanderson presented her supervisor with a note from J.O. Ekunno, M.D., which note suggested that Sanderson be assigned to a sedentary position as a result of her back injury.
7. Due to recreation days, sick days and vacation days, Sanderson appeared for work on nine (9) days during the month of June, 1982.
8. SLU's Director of Security and Director of Personnel reasonably interpreted Dr. Ekunno's note of June 4, 1982, as indicative that Sanderson could not perform the full range of police duties.
9. On June 29, 1982, SLU's Director of Security, Gregory E. Sullivan, met with Sanderson and advised her to contact her physician and request a letter stating that she could perform full police duties. Mr. Sullivan advised Sanderson that SLU did not have "light duty" police positions. Mr. Sullivan also advised Sanderson of other options in the event that she could not obtain the release of her physician: she could request a leave of absence or she could contact SLU's Personnel Department to obtain a temporary position. A July 1, 1982, deadline was set.
10. Sanderson failed to furnish the requested documentation by July 1, and was placed on a Maternity Leave of Absence effective July 1, 1982.
11. Thereafter, Sanderson furnished Mr. Sullivan with Dr. Ekunno's Disability Certificate dated July 6, 1982. This certificate allowed Sanderson to return to work *956 July 15, 1982, but failed to specify whether she could perform "light" or "regular" work. Mr. Sullivan again advised Sanderson that she could return to duty if her doctor would issue a communication authorizing her to perform full police duties.
12. Sanderson responded by furnishing Mr. Sullivan with the following: 1) a July 14, 1982, Disability Certificate of Dr. Ekunno authorizing "light work" only, a "sedentary job" only and "no hip belt"; and 2) a July 16, 1982, Disability Certificate of Robert Rainey, M.D., authorizing "light work duties" only, including "sitting down" only, with "no heavy lifting or bending". Dr. Rainey was the physician retained in connection with Sanderson's May 30, 1982, worker's compensation injury.
13. On July 19, 1982, Sanderson met again with Messrs. Sullivan and Schultz. Again she was advised that she could return to a police position upon presentation of a physician's note authorizing her return to full duty. Sanderson requested a permanent assignment to the Communications and Dispatch desk and her request was denied.
14. On July 21, 1982, Sanderson reported for duty and was refused light duty or a sedentary assignment on the ground that none existed and that her doctors had not released their restrictions on Sanderson's activities.
15. In a letter dated July 26, 1982, Mr. Schultz advised Sanderson that there was a secretarial position open in the Department of Security at SLU and invited her to apply. In the same letter, Mr. Schultz reiterated his position that plaintiff could return to her police position if her physician would certify that she could perform all normal duties of a SLU Campus Police Officer. Sanderson did not respond to Mr. Schultz's letter. Sanderson does not have any secretarial skills.
16. Sanderson's child was born on or about January 24, 1983.
17. Following the birth of her child, Sanderson made no attempt to return to work until May, 1983, when she presented Mr. Sullivan with a May 6, 1983, Disability Certificate, signed by Dr. Ekunno, authorizing her to return to "light work" and a May 11, 1983, Disability Certificate signed by Dr. George, authorizing her return to "regular work."
18. Mr. Sullivan, faced with conflicting statements, advised Sanderson that inasmuch as Dr. Ekunno had treated her maternity condition, SLU would need a return to work authorization from Dr. Ekunno.
19. Sanderson's next attempt to return to work did not occur until mid-July, 1983, when she presented Mr. Sullivan with authorizations from both Dr. George and Dr. Ekunno authorizing a return to "regular work." At this time, Sanderson requested to return to work on August 1, 1983, but Mr. Sullivan insisted that she return on July 21, 1983. Sanderson did in fact return to full duty on July 21, 1983.
20. According to Dr. Ekunno, Sanderson was "totally incapacitated" from the time she last performed work in June of 1982, through and including July 18, 1983.
21. From the time Sanderson last performed duties for SLU in June of 1982, up through and including her return to work on July 21, 1983, she made no effort to find any employment, even though jobs were available both with SLU and other employers.
22. SLU's Department of Security has never had any "light duty" police positions. All police employees of SLU's Department of Security, in whichever of six (6) possible duty posts, are routinely required to prevent the commission of crimes, arrest suspects, engage in physical violence reasonably necessary to subdue persons arrested for the commission of crimes, and maintain order on the Campus. These police employees are also required to render emergency services which require running, bending and heavy lifting, including the transportation of incubators from the helipad and transportation of patients via stretcher. These police employees are on foot a minimum of fifty per cent (50%) of the time.
*957 23. SLU refused to create a permanent Communication and Dispatch position for Sanderson inasmuch as SLU had not previously done so for other officers, and because said position did not conform to the safety restrictions (seated job, light duty, and no heavy lifting or bending) repeatedly communicated by Sanderson's physicians.
24. SLU did not treat other police employees differently than it treated Sanderson.
SLU refused Henry Frank's, a white male officer, request for a change in duty assignment.
Donna Abel, a white female officer, became pregnant and she was offered a secretarial position for the duration of her pregnancy when said position became vacant.
Jane Ahrens, a white female officer, became pregnant and she continued to work a regular duty assignment while she was pregnant, up until three (3) weeks prior to giving birth to a child in February, 1983. Ms. Ahrens did not request a change in duty assignment and never produced medical documentation indicating that her medical condition prevented her from performing all normal duties. In addition, Ms. Ahrens' physician advised SLU in writing that her maternity condition did not prevent her from performing her duties.
Jane Ahrens broke her foot during June of 1982 and wore a cast on her foot for four (4) weeks during July of 1982. For part of this period she was temporarily assigned to the Communications and Dispatch desk, at SLU's request, as a vacation replacement. During the remainder of this period she worked her regular post. Neither assignment was light duty or sedentary work. Ms. Ahrens did not submit a physician's statement to SLU indicating that her work assignments had to be restricted.
Lee Rigdon, a black male officer, had knee replacement surgery in 1981. His regular assignments, before and after the surgery, include the Medical School desk and the doctor's office building, both of which are not light duty or sedentary assignments. Mr. Rigdon never produced medical documentation indicating that his knee condition prevented him from performing all normal duties. Mr. Rigdon never requested a change in his duty assignment.
SLU has never changed an officer's duty post due to a medical condition, unless or until a vacancy existed. A white male police employee, Arthur Cantrell, was terminated because he was physically incapacitated for over one (1) year. Sanderson was not so terminated.
25. The Equal Employment Opportunity Commission concluded that SLU did not discriminate against Sanderson due to her race or sex.
26. Blacks comprised approximately sixteen and two tenths per cent (16.2%) of the private security force employees in the St. Louis Standard Metropolitan Statistical Area. Females comprised approximately five and one-half per cent (5.5%) of the private security force traditionally includes black representation of thirty-seven to thirty-nine per cent (37%-39%) and female representation of sixteen to eighteen per cent (16%-18%).
27. Sanderson's action was not prosecuted in bad faith.

B. CONCLUSIONS OF LAW
This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 2000e-5(f)(3).
In a Title VII cause of action, the plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. If the plaintiff is successful, the defendant must then articulate a legitimate non-discriminatory reason for its actions. In order to sustain this burden, the defendant only need present evidence which raises a genuine issue of fact as to whether it discriminated against the plaintiff. The burden of producing evidence then shifts back to the plaintiff, who must show by a preponderance of the evidence, that the defendant's *958 explanation was merely a pretext for discrimination within the meaning of the statute. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); McDonnell Douglas Corporation v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Coleman v. Missouri Pacific Railroad Company, 622 F.2d 408 (8th Cir.1980); Kirby v. Colony Furniture Company, Inc., 613 F.2d 696 (8th Cir.1980); Meyers v. I.T.T. Diversified Credit Corporation, 527 F.Supp. 1064 (E.D.Mo.1981). Once the defendant responds to the plaintiff's proof by offering evidence of the reason for its actions, the presumption "drops from the case" and the court must then determine whether there was discrimination within the meaning of Title VII. United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, ___, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). The ultimate "`factual inquiry' in a Title VII case is `whether the defendant intentionally discriminated against the plaintiff'." United States Postal Service Board of Governors v. Aikens, 460 U.S. at ___, 103 S.Ct. at 1482 citing Texas Department of Community Affairs v. Burdine, 450 U.S. at 248, 253, 101 S.Ct. at 1089, 1093 (1981). The plaintiff always retains the burden of persuasion with respect to this ultimate factual issue. The division of intermediate evidentiary burdens serves merely to allow the court to evaluate more easily the evidence as it bears on the critical issue of discrimination. Id.
The elements of a prima facie case in a Title VII cause of action vary according to the particular claim that a plaintiff asserts. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 1824 n. 13, 36 L.Ed.2d 668 (1973). Plaintiff Sanderson relies solely ona theory of disparate treatment. Disparate treatment occurs where "[t]he employer simply treats some people less favorably than others because of their race [or sex]." International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).
Applying these principles to the case at bar, it is the opinion of this Court that plaintiff failed to make out a prima facie case of disparate treatment on the basis of race or sex. Plaintiff did not prove that similarly situated white officers or male officers were treated differently. The prior instances which plaintiff relies on are instances of officers who were neither similarly situated nor differently treated. See Finding of Fact No. 24. In said examples, defendant either was not confronted with a physician's imposition of physical restrictions or did not grant a change in duty assignments. Id.
Alternatively, assuming arguendo that plaintiff made out a prima facie case, defendant's actions were taken for a legitimate, non-discriminatory reason. SLU was presented with physicians' statements restricting plaintiff to light or sedentary work. See Findings of Fact Nos. 6, 11, 12, 17. SLU did not and does not have light duty or sedentary positions for its security officers. See Findings of Fact Nos. 22, 23. Defendant had no other choice but to put Sanderson on a leave of absence. Plaintiff did not prove that this reason was pretextual.
This Court is positively convinced that defendant's treatment of plaintiff was not based on her race or sex. Accordingly, defendant is entitled to judgment in its favor on plaintiff's complaint an dsaid complaint is dismissed with prejudice at plaintiff's costs. Although plaintiff's action was very weak, it did not amount to bad faith prosecution and, therefore, defendant is not entitled to an award of attorney's fees.